In re Terri Lynn MORRIS, Debtor.

Terri Lynn Morris, Plaintiff.

v.

University of Arkansas; Banc One Student Loan Trust 1994A, Banc One, Columbus, NA Trustee; North Texas Higher Education Authority; USA Group Secondary Market, Banc One, NA, as Trustee; Arkansas Student Loan Guaranty Foundation, Ronnie Nichoalds, Director, Defendants.

Bankruptcy No. 00–11167M.
Adversary No. 00–1517.

United States Bankruptcy Court,
W.D. Arkansas,
El Dorado Division.

May 20, 2002.

Mark D. Drake, Smith & Drake, McGehee, AR, for Debtor.

William S. Meeks, Crossett, AR, U.S. Bankruptcy Trustee.

## MEMORANDUM OPINION

JAMES G. MIXON, Chief Judge.

Terri Lynn Morris ("Debtor") filed this adversary proceeding on August 4, 2000, to determine the dischargeability of education loans resulting in indebtedness to the Student Loan Guaranty Foundation of Arkansas ("SLGF") and other defendants who have either defaulted or been dismissed from this action. The Debtor alleges that repaying the indebtedness to SLGF would cause undue hardship to her and her dependents.

After a hearing on the complaint on March 27, 2002, in El Dorado, the Court took the matter under advisement.

The Court has jurisdiction under 28 U.S.C. § 1334 and § 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I)(1994), and the Court may enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### FACTS

The Debtor is a 34–year–old home economics teacher who lives in Montrose, Arkansas, and teaches in the Lakeside Public

Schools in Lake Village, Arkansas, which is 14 miles from the Debtor's residence. The Debtor's net pay from her teaching position is $1661.95 a month.

Her husband, who is not a joint debtor in bankruptcy, is a farm laborer with a ninth grade education. He earns $6.50 an hour and nets about $1100.00 a month but does not work in December and January of each year because of the seasonal nature of his employment. His place of employment is 18 miles from his home. He is not covered by any type of health insurance plan. He testified at the hearing that his job prospects will improve if he can acquire a special driver's license which would make him eligible for jobs that pay a higher hourly wage and provide benefits.

The Debtor's 11-year-old daughter from a previous marriage resides with her father in Ft. Smith, Arkansas, during the school year and with the Debtor during two months in the summer. The Debtor neither pays nor receives child support. She and her current husband have a four-year-old son. She does not work during the summer months, stating that child care for two children would cost $100.00 a week and that such an expense would negate any earnings from summer employment.

From the fall of 1988 to 1994, the Debtor attended undergraduate school at the University of Arkansas, receiving a Bachelor of Science in home economics. To pay for her education and living expenses, she worked part time and borrowed funds from various sources. SLGF guaranteed payment on some of these loans. The aggregate of the principal amounts borrowed and guaranteed by SLGF for this period is approximately $17,000.00.

Unable to find work after graduation, the Debtor enrolled in graduate school, motivated by the fact that she could defer repaying her student loans while a student. She remained enrolled in graduate school as a student in good standing for about five years, during which time she became indebted on some $77,000.00 in loans guaranteed by SLGF. The proceeds from these loans were used to pay her education and living expenses. The Debtor never completed requirements for her graduate degree, lacking one class and the submission of a thesis. If the Debtor acquires the graduate degree, she will be eligible for a $1500.00 pay raise at her current job.

In 1996 the Debtor moved to south Arkansas but remained enrolled in graduate school so that she continued to receive student loans. Subsequently, the Debtor was hired as a full time teacher and eventually became certified and licensed by the State. She has been a certified teacher in the Lake Village schools for the past year and a half. The Debtor acknowledged that she has never made a single payment on her student loan obligations and has never requested forbearance or sought other administrative remedies.

On March 27, 2000, the Debtor filed a chapter 7 petition in bankruptcy. On Schedule F of the petition, she listed seven unsecured, nonpriority claims held by Banc One Student Loan Trust 1994 or U.S.A. Group Secondary Market that were guaranteed by SLGF.[1] These claims are listed as follows:

$ 6282.21
8500.00
13500.00
3000.00
65912.00
1959.00
8500.00

---

1. The individual claim amounts listed on Schedule F do not correspond to the face amounts or the actual number of notes for student loans that the Debtor signed that were guaranteed by SLGF. Presumably some of the notes were consolidated, and accrued interest has been incorporated into the balances, which accounts for the discrepancy.

The parties stipulated that the Debtor currently owes $121,776.58 to SLGF, which includes $109,261.97 in principal. At least 90 percent of her unsecured debt results from student loans.

The Debtor and her husband purchased a home in May 1999 for $15,500.00. At some point after the filing of the petition, the Debtor and her husband refinanced their home, incorporating obligations for insurance and taxes into the monthly payment, reducing the loan's interest rate from 11 percent to 9 percent, and reducing the duration of the loan to ten years. They increased the indebtedness on their home so that they could purchase a used vehicle for the Debtor's husband to drive to and from work. Thus, their house payments increased from $178.00 to $320.00. The Debtor and her husband owe about $16,000.00 on their house, which has been appraised for $24,150.00.

Some three months prior to the hearing, the Debtor's husband purchased a new, mid-sized car in his name which the Debtor drives. He paid approximately $22,000.00 for the car. The Debtor explained that her previous vehicle had developed mechanical problems requiring $3000.00 worth of work. She testified that because $11,000.00 was still owed on the car, the car dealership would only take the car in trade and pay off the indebtedness if exchanged for a new car. The Debtor further testified that the vehicle purchased was the least expensive car on the lot in the mid-size category. The car payment, made by her husband, is $468.00 a month.

In addition to modest living expenses, the Debtor and her husband are paying $437.20 a month on consolidated credit card debt of approximately $18,000.00 incurred by charges to credit cards, all but one of which are in the husband's name. This debt will be paid in approximately nine years. The Debtor's schedules of income and expenses take into account the Debtor's husband's indebtedness and income. The schedules reflect that the family's income does not meet monthly expenses by some $50.00.

At the hearing, Shirley McAlister of SLGF testified that the Debtor would probably qualify for a William D. Ford Foundation Income Contingent Repayment Plan. The program would require the debtor to pay approximately 15% of her family's adjusted gross income toward the total indebtedness. After 25 years of payments, she would be eligible for loan forgiveness, although the amount forgiven would incur an income tax liability. Considering the Debtor and spouse's current income, the payments would be about $438.00 a month. Payments at this rate would only defray some accruing interest and no principal.

## DISCUSSION

The Bankruptcy Code provides:

A discharge under section 727 . . . does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents . . .

11 U.S.C. § 523(a)(8) (1994).

■ This provision of the Bankruptcy Code clearly states that educational loan debts guaranteed by a governmental unit may only be discharged if paying such debts would impose an undue hardship on the debtor and his dependents. *Morgan v.*

*U.S. Dept. of Higher Educ. (In re Morgan)*, 247 B.R. 776, 780 (Bankr.E.D.Ark. 2000). The debtor seeking discharge of an educational loan debt has the burden of proving that repayment of the debt will impose an undue hardship. *Maschka v. Nebraska Higher Educ. Loan Programs (In re Maschka)*, 89 B.R. 816, 818 (Bankr. D.Neb.1988) (citing *In re Binder*, 54 B.R. 736 (Bankr.D.N.D.1985); *In re Price*, 25 B.R. 256 (Bankr.W.D.Mo.1982)).

■ Bankruptcy courts in the Eighth Circuit must assess undue hardship under the test formulated in *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702 (8th Cir.1981). The test requires an analysis of (1) the debtor's past, present, and reasonably reliable future financial resources; (2) the debtor's and debtor's dependents' reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding the case. *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 139 (8th Cir. BAP 1999) (citing *In re Andrews*, 661 F.2d at 704). To prove undue hardship, the debtor must demonstrate that he is unable to earn sufficient income to maintain himself and his dependents at a minimal standard of living and, at the same time, repay the educational debt. *In re Andrews*, 661 F.2d at 704.

■ Other relevant facts and circumstances may include the following:

(1) Total incapacity now and in the future to pay one's debts for reasons not within the control of the debtor.

(2) Whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment.

(3) Whether the hardship will be long-term.

(4) Whether the debtor has made payments on the student loan.

(5) Whether there is permanent or long term disability of the debtor.

(6) The ability of the debtor to obtain gainful employment in the area of study.

(7) Whether the debtor has made a good faith effort to maximize income and minimize expenses.

(8) Whether the dominant purpose of the bankruptcy petition was to discharge the student loans.

(9) The ratio of student loan debt to total indebtedness.

*D'Ettore v. Devry Inst. of Tech. (In re D'Ettore)*, 106 B.R. 715, 718 (Bankr. M.D.Fla.1989) (citations omitted).

■ In the case of multiple educational loans or obligations, the statute requires that the bankruptcy court apply the test for undue hardship to each educational loan rather than to the total of the indebtedness for educational loans. *In re Andresen*, 232 B.R. at 137. *See also Hollister v. University of N.D. (In re Hollister)*, 247 B.R. 485, 493 (Bankr.W.D.Okla.2000) (finding six of 13 notes to student loan creditors were dischargeable); *Williams v. Missouri So. State College (In re Williams)*, 233 B.R. 423, 430 (Bankr.W.D.Mo.1999) (discharging student loan debt to one creditor but finding smaller debt to another creditor nondischargeable); *Hinkle v. Wheaton College (In re Hinkle)*, 200 B.R. 690, 693 (Bankr.W.D.Wash.1996) (considering each student loan separately for purposes of dischargeability).

Under the Andrews "totality of circumstances" test, the first prong is an analysis of the Debtor's past, present, and future resources. From the evidence presented, it appears that the Debtor has a stable position with the school district that she has held for several years. As a public school teacher, she will receive modest annual raises calculated on cost of living or dictated by law. Additionally, she will re-

ceive an automatic pay raise of $1500.00 when she completes her master's degree.

Significantly, the Debtor is not working during two months in the summer, a period when she could find employment to supplement the family budget. Many school teachers, whether parents of small children or not, maximize their income in this way. The Court notes that the Debtor's daughter is eleven years of age and will soon be old enough to babysit for her younger brother, if she has not already reached that point.

Until the Debtor can avail herself of a free babysitter, she may find a child care position or other similar types of summer employment that will allow her to care for her own children while on the job. The Debtor may have to seek such employment in larger nearby towns than Montrose; however, this should not create a hardship since she has reliable transportation. A conservative estimate is that the Debtor has the potential to net an extra $2500.00 annually, including annual pay raises from her teaching position, if she works during the summer months and obtains her graduate degree.

The Debtor's husband works at a minimum wage job but has prospects for better employment after he attains his special driver's license. If he continues in his current position, he can and should find a supplemental job for the two months during the winter when he does not work. In light of the financial plight of his family, the Debtor's husband might also seek weekend or evening part time work. In any event, the Debtor's husband has the potential to net at least $1000.00 more annually.

In short, the Debtor and her husband are netting $2761.95 a month but could bring in another $3500.00 or more annually if the couple maximized their income.

Under the second prong of the test, the Court must examine the Debtor's reasonable living expenses. For the most part, the Debtor's expenses are reasonable, with some notable exceptions. Chief among these is the Debtor's husband's car payment of $468.00 a month on a new $22,000.00 station wagon. Although the Debtor needs transportation to and from work, the Debtor cannot afford this particular car. Considering her precarious financial position in bankruptcy, she should have repaired her old car for $3000.00, or she should have shopped with a car dealer who would have taken her old car in trade and sold her a cheaper vehicle in the bargain. Instead, the Debtor and her husband bought a car that is valued at a few thousand dollars less than their home. The car, of course, will depreciate rapidly in value while the real estate will not.

Also important in examining the Debtor's expenses is the fact that the Debtor's refinancing of her home resulted in a house payment almost double the previous payment. While it made good sense to purchase a vehicle for the Debtor's husband from some of the proceeds of the refinancing, it did not make sense, given the Debtor's financial condition, to refinance for a shorter period when a 30–year fixed loan would have resulted in a lower house payment than $320.00 a month. For example, a $24,000.00 loan paid at a 9 percent interest rate over 30 years would require a monthly payment of $193.11, not including property taxes and insurance.

As things now stand, the Debtor and her husband will pay off their home in nine years, and they currently have about $8000.00 in equity in the residence. At least some of this equity could be applied to decrease indebtedness on the car or the credit card consolidation loan so that monthly payments on one of these could be decreased. For example, if the credit card

debt of $18,000.00 were reduced by a payment of $5000.00 and then amortized at 9 percent over ten years, the monthly payments would be $164.68, not the $437.20 a month the Debtor and her husband now pay.

Under the second prong, the Court finds that most of the Debtor's expenses are reasonable with the exception of the house and car payments. By applying the equity in the house to other long term indebtedness and/or refinancing over a longer period, the Debtor will minimize expenses, and her budget will yield an extra $200.00 a month or $2400 a year to apply to student loan debt.

Under the third prong of the test, the Court examines special circumstances relevant to undue hardship. The Debtor and her husband are young, healthy, and have stable but relatively low-paid jobs. Neither suffers from any disability, nor do their children. The Debtor has found employment utilizing her chosen field of study, and she has some potential for advancement. As part of the curriculum for her degree, she has studied consumer economics and teaches career orientation, two areas of expertise that should give her guidance in how to better her family's financial condition. She lives in an area that is within at least two hours' driving time to colleges and larger communities offering education and employment opportunities. All these facts support a finding that the Debtor is capable of repaying at least some of her student loans without undue hardship.

Other circumstances that are relevant in this case include the fact that student loan indebtedness comprises 90 percent of the Debtor's unsecured, nonpriority debt, and the Debtor has not made any payments toward the obligations, although the loans are not in default. While the Court does not find an element of bad faith in this case, it is good policy to encourage the repayment of these publicly funded loans from which the Debtor will reap lifelong benefits. Therefore, these circumstances also support a finding of no undue hardship.

Under the rule in *Andresen*, each student loan or obligation must be examined separately to determine whether repayment would create undue hardship. All student loan obligations under consideration here are owed to the same creditor, and the record does not reflect exactly what month and year the separate obligations were incurred. Therefore, the Court will begin its undue hardship analysis with the largest obligation.

■ The Court finds that the Debtor has carried her burden by demonstrating that repaying $65,912.00 would create undue hardship on the Debtor and her dependents. If the Debtor repaid this debt over ten years at 8.5 percent, her monthly payment would be $817.21. Stretching payments over 20 years would yield payments of $572.00. Although the Court believes that the Debtor has not maximized her income and minimized her expenses, even were she to do so, a monthly payment in either of the above amounts would cause undue hardship now and in the foreseeable future.

■ However, the Court finds that the Debtor is able to repay the remaining student loans in the aggregate sum of $41,741.21 without undue hardship. These debts consolidated at an 8.5 percent interest rate and paid over twenty years would require a monthly payment of $362.24. In the Court's estimation, this payment is entirely within the Debtor's present ability to repay without undue hardship, provided she and her husband supplement their income and reduce expenses as previously discussed.

## CONCLUSION

The Debtor has not carried her burden of proof to show that repaying the following obligations guaranteed by SLGF will create undue hardship for her and her dependents: claims by Banc One Student Loan Trust 1994 for $6282.21, $8500.00, $13,500.00, $3000.00, and claims by USA Group Secondary Market for $1959.00 and $8500.00. These obligations in the aggregate sum of $41,741.21 are, therefore, nondischargeable. The Debtor has demonstrated that repaying the claim of USA Group Secondary Market for $65,912.00 will impose an undue hardship on her and her dependents, and that sum will be discharged.

IT IS SO ORDERED.