In re James Chandler MULHERIN,
Stasia Eileen Mulherin,
Debtors.

James Chandler Mulherin, Plaintiff,

v.

Sallie Mae Servicing Corporation,
Defendant,

Educational Credit Management
Corp., Intervenor.

Bankruptcy No. 02–00463.
Adversary No. 02–9069.

United States Bankruptcy Court,
N.D. Iowa.

June 27, 2003.

Steven G. Klesner, Iowa City, IA, for Debtors.

## ORDER RE COMPLAINT TO DETERMINE DISCHARGEABILITY

PAUL J. KILBURG, Chief Judge.

On May 29, 2003, the above-captioned matter came on for trial on Debtor's Complaint to Determine Dischargeability of Debts. Debtor/Plaintiff James Chandler Mulherin appeared with his attorney, Steven Klesner. Attorney Christopher Foy appeared for Intervenor Educational Credit Management Corporation. Evidence was presented after which the Court took the matter under advisement. All briefs are filed and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## STATEMENT OF THE CASE

Debtors James and Stasia Mulherin filed their Chapter 7 petition on February 20, 2002 and were granted a discharge on May 28, 2002. The case was reopened to allow Debtor/Plaintiff James C. Mulherin to file an adversary complaint seeking a determination that his consolidated student loan is dischargeable based on undue hardship as defined by 11 U.S.C. § 523(a)(8). Sallie Mae Servicing Corporation was named as Defendant. Educational Credit Management Corporation is the assignee of all student loans and is the real party in interest.

## FINDINGS OF FACT

James Mulherin lives in Iowa City, Iowa. He is 38 years of age. After graduating from high school in 1983, he enrolled at the University of Iowa. In 1991, he completed his Bachelor of Science degree in physics with minors in mathematics and German. He then entered the University

of Iowa master's program in physics, but withdrew after a semester and a half.

Mr. Mulherin held part-time and full-time restaurant jobs until 1988. He then worked for Sheller–Globe Corp., making automobile parts on an assembly line. During his senior year at the University of Iowa, he became interested in optics, and began experimenting with grinding lenses. After graduation in 1991, he began a business as a sole proprietorship, which incorporated in 1994 to become Torus Precision Optics, Inc. (Torus). As of the filing date of Debtors' Chapter 7 petition, Mr. Mulherin owned 29.1 percent of Torus' stock and served as its chief executive officer, earning an annual salary of $50,000.

Stasia Mulherin did not complete high school and does not have her GED. She is employed by Torus, working twenty to thirty hours per week at $10 per hour. She also cares for the family's three children.

In 2000, Torus was struggling financially. Mr. Mulherin attributes this to the sagging U.S. economy and increased competition from Eastern European optical companies. Torus had thirty-four employees at the time. To solicit new investors, Mr. Mulherin agreed to "down-round" financing, in which new investors required him to increase his personal stake in the company. He did so by borrowing the necessary funds.

Mr. Mulherin and other Torus employees worked without pay when the company did not have sufficient funds to meet payroll. This hurt Debtors financially in two ways. First, Torus never paid the missed payrolls, causing their personal finances to deteriorate. Second, two months after Debtors' May 28, 2002 discharge, the Internal Revenue Service (IRS) assessed a $65,791.24 Trust Fund Recovery Penalty against Mr. Mulherin personally. This was due to Torus' failure to pay its Form 941 employer federal tax withholdings for three consecutive quarters ending March 31, 2001.

Torus ultimately defaulted on its debts, liquidated its assets, and dissolved. One of Torus' investors purchased the assets and technology and, on July 26, 2002, incorporated Optical Mechanics, Inc. (OMI) to fulfill Torus' outstanding contracts. OMI officially purchased Torus' assets on January 9, 2003. OMI is current on its payroll obligations for its six employees, although it has been a week late with payroll on several occasions.

Mr. Mulherin serves on the board of OMI. He is also its president, earning an annual salary of $50,000. He spends roughly 80 percent of his time doing precision work in OMI's optics shop. His proportional stock ownership in OMI is 19.8 percent, less than his former 29.1 percent holdings in Torus. He does not personally guarantee any of OMI's obligations.

While at the University of Iowa, Mr. Mulherin received several student loan disbursements. On November 5, 1992, he consolidated $31,140.50 of student loans through Sallie Mae Servicing Corporation at 9 percent interest. Sallie Mae assigned the consolidated loan to American Student Assistance, which subsequently assigned it to Educational Credit Management Corporation (ECMC), the current holder of record. Debtors list the consolidated student loan debt as $41,247.62 on Schedule F of their Chapter 7 petition. ECMC claims that Mr. Mulherin owed a total of $43,229 in principal and interest as of July 9, 2002. Interest continues to accrue at the rate of about $10.60 per day.

Mr. Mulherin has paid a total of $19,169.76 on his student loans since consolidation in 1992. Of this amount, $17,995.55 was interest expense. He made his last payment in July 2000. Mr. Mulhe-

rin obtained three– and six-month deferments on nine occasions between 1992 and 2002.

He has communicated with ECMC regarding his financial condition. However, he has not taken steps to refinance his student loan. Mr. Mulherin is aware of the U.S. Dept. of Education's Income Contingent Repayment Plan. He doesn't consider it a viable option because he believes he could not afford the payments, even if the interest rate were reduced. A thirty-year amortization of the outstanding balance at 9 percent interest would result in monthly payments of about $345. Every percentage point by which the interest rate drops below 9 percent would reduce the resulting monthly payment by $25 to $30.

On Schedule E of their Chapter 7 petition, Debtors list a $3,658.95 priority debt to the Iowa Dept. of Revenue and Finance (IDRF). Mr. Mulherin testified that IDRF is currently garnishing $150 from each of his semi-monthly paychecks from OMI, and that this debt will be paid in full by the end of 2003.

Debtors also owe a significant amount to the IRS. They list unsecured priority debt to the IRS of $9,080.05 for 2000 income tax. On May 5, 2003, the IRS offset Debtors' entire $2,097 federal tax refund against this balance. Mr. Mulherin testified that, due to the magnitude of this IRS liability, he could not service even the interest on his student loan, let alone repay the entire balance.

Mr. Mulherin is attempting to compromise his federal tax debt. He initially sent the IRS an Offer in Compromise for $100. The IRS proceeded to obtain financial information from Mr. Mulherin regarding Debtors' finances in order to determine his "Reasonable Collection Potential" (RCP). The IRS calculates Debtors' RCP by adding together Debtors' cash and bank accounts, investments, equity in vehicles, and a number representing forty-eight months times the excess of Debtors' gross monthly income over allowed expenses. The IRS tendered a counteroffer for $55,883 on March 27, 2003, followed by a second counteroffer for $47,387 on April 30, 2003, which is based on revised estimates of Debtors' housing and utilities expenses.

The April 30 counteroffer estimates Debtors' monthly gross household income at $5,166 per month, and allowed expenses at $5,031. The difference of $135 over forty-eight months is $6,480. The IRS then adds the $1,193 balance of Debtors' joint bank account, a $10,130 estimate of the equity in Debtors' vehicles, and the $29,584 computed value of Mr. Mulherin's OMI stock. The IRS values his 41,667 shares at $0.71 per share, based on the value of OMI's original asset purchase agreement, multiplied by Mr. Mulherin's percentage of stock ownership.

Mr. Mulherin disputes the IRS' calculations because they assume the sale of both of his vehicles, they assume no student loan liability, and they value his 41,667 shares of OMI stock at $29,584, or $0.71 per share. Mr. Mulherin contends that his OMI stock currently has no value, as OMI is heavily leveraged and has not yet been proven to be viable as a going concern. He testified that OMI's future hinges on his continued employment and expertise. The court notes that, as an employee at will, Mr. Mulherin has no legal obligation to remain at OMI if forced to sell or surrender his stock. There is no indication that Mr. Mulherin has considered or attempted to sell his stock in OMI or to surrender it to the IRS.

Debtors own two vehicles. The first is a 1984 Porsche 911, appraised at $7,500. The Porsche is currently encumbered by a lien of about two thousand dollars, which

Debtors expect to pay in full by the end of 2003. The second vehicle is a 1986 BMW 535i, appraised at only $500 due to its current state of disrepair.

Debtors have three children, a seventeen-year-old daughter, a sixteen-year-old son with Down's syndrome, and a thirteen-year-old son with Tourette's syndrome. Both sons receive continuing medical treatment. The sixteen-year-old son has undergone multiple ear surgeries to improve his hearing, and is expected to need hearing aids soon. Debtors expect him to live with them indefinitely, but have not investigated sources of governmental aid to defray the cost of his long term care.

Debtors own a single-family home in Iowa City, Iowa. It is appraised at $122,000. As of May 7, 2003, it is encumbered by two mortgages totaling approximately $97,800. Debtors' $805 monthly house payment includes property tax and insurance.

Debtors currently have monthly gross income of about $5,100. They estimate that their future monthly expenses will average $4,120. This total, however, excludes current-year tax withholdings, student loan payments, IRS payments for past-due taxes, and extraordinary expenses. Debtors' pay stubs for May 2003 indicate that their current withholdings for federal income tax, FICA, and state income tax total about $1,065 per month.

Including payroll withholdings, Debtors' monthly expenses with current withholdings average $5,185. This slightly exceeds their monthly household income, creating a negative cash flow before any payment on past-due IRS obligations or student loans. The $458 monthly payment for the auto loan and the $300 monthly IDRF garnishment will end by the close of 2003, reducing Debtors' monthly expenses by $758. Their projected monthly expenses include $114.50 per month for digital cable television and high-speed Internet access, and $100 for entertainment and recreation. Mr. Mulherin testified that the $600 monthly grocery expense includes $100 in tobacco products for Mrs. Mulherin.

## CONCLUSIONS OF LAW

■ A discharge under 11 U.S.C. § 727 does not automatically discharge debts arising from student loans. 11 U.S.C. § 523(a)(8) (2002). Student loan debts are excepted from discharge unless it would impose "undue hardship" on the debtor or the debtor's dependents. *Id.* "The debtor bears the burden of proving undue hardship by a preponderance of the evidence." *In re Long,* 292 B.R. 635, 638 (8th Cir. BAP 2003). Section 523(a)(8) "undue hardship" only exists in cases where there is a "certainty of hopelessness" that the debtor will ever be able to repay the loan. *U.S. Dept. of Educ. v. Meling,* No. 01–2027, 2002 WL 32107248, at *5 (N.D.Iowa Jan.22, 2002) (Melloy, J.).

■ The Eighth Circuit Court of Appeals recently clarified § 523(a)(8) and reaffirmed "a totality-of-the-circumstances approach to the 'undue hardship' inquiry." *In re Long,* 322 F.3d 549, 554 (8th Cir. 2003). "The bankruptcy court must determine whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living." *In re Andrews,* 661 F.2d 702, 704 (8th Cir.1981). "[F]airness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy." *Long,* 322 F.3d at 554.

In evaluating the totality-of-the-circumstances, our bankruptcy reviewing courts should consider: (1)the debtor's

past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case. Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged. Certainly, this determination will require a special consideration of the debtor's present employment and financial situation—including assets, expenses, and earnings—along with the prospect of future changes—positive or adverse—in the debtor's financial position.

*Id.* at 554–55 (citations omitted).

 In considering the debtor's past, present, and reasonably certain future resources, the court examines the debtor's employment, work history, and earnings capability. *In re Cheney,* 280 B.R. 648, 661 (N.D.Iowa 2002). Long-term physical infirmities may prevent the debtor from securing or sustaining gainful employment. *In re Meling,* 263 B.R. 275, 279 (Bankr. N.D.Iowa 2001). Both earnings and unearned sources of income are included when considering a debtor's resources. *Andrews,* 661F.2d at 704. In *Schmidt,* the court noted that the co-debtor was within six credit hours of completing his master's degree, which would increase his future earning potential. *In re Schmidt,* No. 02–4382, 2003 WL 21297339, at *5 (Bankr. W.D.Mo. June 4, 2003).

 The debtor's total living expenses should not exceed what is reasonable and necessary. *Long,* 292 B.R. at 638. To be reasonable and necessary, expenses must be modest, not extravagant, and commensurate with the debtor's re-

sources. *Meling,* 2002 WL 32107248, at *5. Provided that total expenses remain minimal, the debtor is not expected or required to implement every conceivable cost-saving measure. *Id.* at *5.

 The Eighth Circuit requires courts to consider all other relevant circumstances before determining undue hardship. *Long,* 322 F.3d at 554. For example, the debtor may be qualified and able to earn significantly more in a different job or field. *In re Wilson,* 270 B.R. 290, 294 (Bankr.N.D.Iowa 2001). Having a disabled spouse or dependents may necessitate a greater commitment of time and money while limiting the debtor's realistic job opportunities. *In re Ford,* 269 B.R. 673, 676 (8th Cir. BAP 2001). Information regarding the health and ages of the debtor's dependent children assists in projecting their future needs and expenses. *In re Powers,* 235 B.R. 894, 899 (Bankr.W.D.Mo. 1999). Outstanding state or federal tax deficiencies, assessments, or garnishments against the debtor limit the debtor's ability to repay. *In re Joyner,* 146 B.R. 232, 234 (Bankr.W.D.Mo.1992). The debtor's student loan repayment history is relevant to show the debtor's past commitment and ability to repay in light of the debtor's financial circumstances. *In re Soler,* 261 B.R. 444, 459 (Bankr.D.Minn.2001).

 The court must consider whether the resolution of any present contingency would alter a determination of undue hardship, rendering the question of dischargeability unripe for adjudication. *In re Eiklenborg,* 286 B.R. 718, 725 (Bankr.N.D.Iowa 2002). Failure to pursue deferment, alternative payment programs, or applicable administrative remedies may be grounds for denying a debtor's discharge complaint. *Wilson,* 270 B.R. at 294–95. In *Scholl,* a college failed to refund the debtor's student loan proceeds to

**566**

the lender upon the debtor's timely withdrawal. *In re Scholl*, 259 B.R. 345, 348–49 (Bankr.N.D.Iowa 2001). This Court found that the debtor had an apparent statutory cause of action against the college for refund of the student loan, and subsequently dismissed his complaint without prejudice against refiling, pending its resolution. 20 U.S.C. § 1087(c)(1) (1998); *Scholl*, 259 B.R. at 349.

## ANALYSIS

■ Debtor seeks a determination that excepting his student loan from discharge would impose an undue hardship on him and his dependents pursuant to § 523(a)(8). This Court evaluates this request in view of the totality of Debtors' circumstances. The Mulherins do not lack the ability to earn substantial income. Mr. Mulherin possesses a degree in physics and valuable occupational skills. When Torus dissolved, its assets and technology ultimately became the property of OMI. Mr. Mulherin is both the president and a 19.8 percent owner of OMI, earning a $50,000 annual salary. OMI continues to employ Mrs. Mulherin at $10 per hour.

Debtors' monthly expenses do not appear unreasonable. By the end of 2003, state tax garnishments and car payments will end. This will reduce expenses by $758 per month, providing Debtors with $600 per month of income in excess of projected expenses. Debtors appear to have other viable but unexplored means of reducing their monthly expenses. Refinancing Mr. Mulherin's student loan at current interest rates could considerably lower monthly interest expense. Debtors have not explored sources of government aid as they continue to provide care for their sixteen-year-old son into his adulthood.

In his dealings with the IRS, Debtor listed his student loan obligation as "To Be Determined." He then treated the amount as zero for purposes of calculating his expenses for the IRS. This Court recognizes that Mr. Mulherin and the IRS have not yet reached an agreement, and that several factors, among them, Debtors' vehicle problems, monthly expenses, and the continued viability of OMI, may dramatically influence Debtors' ultimate liability to the IRS.

By the end of the year 2003, Debtors project that they will have over $600 of monthly income in excess of expenses. This amount can be applied toward the student loan debt and the IRS debt. Debtors' IRS liability comprises the largest remaining unsecured debt, and is the crux of Mr. Mulherin's Complaint to Determine Discharge of Debts. But Debtors' ultimate IRS liability remains in question. *See Scholl*, 259 B.R. at 348–49 (debtor's statutory remedy precluded determination of dischargeability on the merits); *and see Eiklenborg*, 286 B.R. at 725 (dischargeability of a debt not yet owed was not ripe for determination).

Mr. Mulherin's ongoing dealings with the IRS pose some question whether his Complaint to Determine Discharge of Debts is ready for determination. However, regardless of whether Debtors must ultimately pay the IRS $47,387 or some lesser amount, Debtor James Mulherin has failed to satisfy, by a preponderance of the evidence, the "certainty of hopelessness" required to overcome the § 523(a)(8) exception from discharge for his student loan. *In re Meling*, No. 01–2027, 2002 WL 32107248, at *5 (N.D.Iowa Jan. 22, 2002) (Melloy, J.). Debtors' financial picture is certainly less than ideal. Legitimate reasons exist to be concerned about Debtors' day to day finances. However, the standard for discharge of this type of obligation has intentionally been set at a very high level. To grant a discharge based on

sympathy for Debtors' plight would be to reduce the standard well below that intended in legislative history and case law. In this case, the standard has not been met.

**WHEREFORE,** Debtor James Mulherin's student loan obligation owed to Educational Credit Management Corporation (ECMC) is excepted from discharge pursuant to § 523(a)(8).

**FURTHER,** judgment shall enter accordingly.