**In re Catherine Winona FAHRER, Debtor.**

**Catherine Winona Fahrer, Plaintiff,**

v.

**Sallie Mae Servicing Corp., et al. Defendants.**

**Bankruptcy No. 03–20259.**
**Adversary No. 03–2019.**

United States Bankruptcy Court, W.D. Missouri.

March 4, 2004.

Charles F. Johnson, Osage Beach, MO, for Plaintiff.

N. Larry Bork, Goodell, Stratton, Edmonds & Palmer, LLP, Topeka, KS, for Defendant.

## MEMORANDUM OPINION AND ORDER

DENNIS R. DOW, Bankruptcy Judge.

In this adversary proceeding, plaintiff Catherine Winona Fahrer ("Debtor") seeks a determination, pursuant to 11 U.S.C. § 523(a)(8), that her consolidated student loan debt, now held by defendant Educational Credit Management Corporation ("Defendant") should be discharged for the reason that excepting the debt from discharge would impose upon her an undue hardship. This is a core proceeding of which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and which it may hear and determine pursuant to 28 U.S.C. § 157(a), 157(b)(1) and 157(b)(2)(I). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I find that the Debtor has satisfied her burden of proving that repayment of the debt owed to Defen-

dant would impose an undue hardship upon her and is therefore not excepted from discharge under § 523(a)(8).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Debtor seeks a discharge of her liability on what began as numerous separate student loans taken out over a 12–year period from 1984 to 1996 to finance courses of study at several different institutions designed to prepare her for a career in the ministry. During this period of time, Debtor obtained a Certificate in Biblical Studies, a Bachelor of Arts Degree in Psychology and Religion, a Masters in Divinity and a Masters in Religious Studies. Her various student loans were consolidated on March 27, 1997, into a new loan in the amount of $104,128.16. That indebtedness was to be repaid at the rate of 9% over a 30–year period on a schedule under which the monthly payments varied slightly in amount over the term, but were approximately $800.[1] The lender on the consolidation loan was Sallie Mae; the loan was assigned to Defendant on July 4, 2003.[2] A Proof of Claim filed in the case showed the balance on the loan as of May 19, 2003 as $174,472.40.[3] The balance on the loan as of August 3, 2003 had grown to $177,970.39 with interest accruing each day thereafter at the rate of $43.48.[4] As of September 30, 2003, the debt was $180,196.15.[5]

Debtor testified that her post-graduate career plan was to find a church in which she could serve as a co-pastor with her spouse. She was advised that in that role she might expect to be able to earn from $30,000 to $40,000 per year. That plan has, however, not been realized, primarily due to problems with her spouse's health and emotional state. According to testimony provided both by the Debtor and her husband, Debtor's husband is afflicted with a myriad of medical conditions, including heart problems, high blood pressure, amyotrophic lateral sclerosis, diabetes, kidney problems, depression and anxiety disorder.[6] He was recently diagnosed with prostate cancer and completed an intensive course of chemotherapy. His prognosis is unclear. In 1995, he was declared permanently and totally disabled by the Social Security Administration and the Veteran's Administration from both of which he receives a monthly benefit.

Debtor has not been able to work on a full time basis since 1998. For the last several years, she has been employed periodically as a substitute teacher. She testified that she has not been able to obtain or sustain employment in the ministry or in social work, an area in which she also has qualifications, because of the demands on her time created by her husband's physical problems. Debtor maintains she must have the flexibility to be available to tend to her husband's needs, including management of the 36 different medications he is required to take. Her husband also apparently suffers occasional irregular levels of blood sugar or blood pressure which have required hospitalization or visits to the emergency room. Mr. Fahrer testified that he has had to be taken in as many as 15 times during the course of a year. His weakened condition can also cause him to lose his balance and fall numerous times during each day, sometimes resulting in injury, one of which recently required knee surgery.

1. Defendant's Ex. 1.

2. Defendant's Ex. 3.

3. Defendant's Ex. 2.

4. Defendant's Ex. 4.

5. Defendant's Ex. 12, ¶ 9.

6. Debtor's Ex. 1 and 2.

The monthly income of Debtor and her spouse consists in part of disability payments in the amount of $798.00 from the Social Security Administration, $2,408.00 from the Veteran's Administration and an additional $423.00 per month received from the Social Security Administration for the couple's 16–year–old daughter who is currently living with them.[7] Debtor supplements that income with what she has been able to earn from substitute teaching. When she can work, Debtor earns $57.00 per day of which she nets approximately $50.00. On average, she estimated earnings of approximately $140.00 per month, the figure included in the Schedule of Current Income (Schedule I) filed with the petition.[8] According to that Schedule, combined monthly income is approximately $3,769.00. In 2001, her adjusted gross income was $888.00;[9] in 2002, it was $3,485.00.[10] As of the date of the hearing, Debtor had earned approximately $1,661.00 in 2003 from her employment as a substitute teacher.

According to her Schedule of Current Expenses (Schedule J),[11] Debtor's monthly household expenses are $3,892.00. In an updated estimate of those expenses supplied in response to Defendant's interrogatories and reiterated in trial testimony, Debtor claims monthly expenses of $4,198.78.[12]

In 1997 and 1998, Debtor made some payments on the loan in the amount of approximately $79.00 per month, which were based on her income at the time. Debtor stopped making those payments and made inquiry about a deferment, but was told that no deferment was possible. Debtor admits she has since been made aware of the availability of the William D. Ford program providing options for repayment of her consolidated loan. According to the affidavit of Amy Schreiner,[13] the program offers student loan debtors several options, including an Extended Repayment Plan and a Graduated Repayment Plan involving payments for up to 30 years or a plan involving the making of monthly payments contingent upon the Debtor's disposable income (the Income Contingent Repayment Plan or "ICRP"). Under the last option, the Secretary of the Department of Education would annually recalculate the required monthly payment based on the borrower's adjusted gross income, a variable interest rate, certain income percentage factors published in a table included in an annual notice published by the Secretary and, if applicable, updated Department of Health and Human Services Poverty Guidelines. If the borrower's adjusted gross income is below those guidelines, no payments would be required on

7. These figures are taken from Defendant's Ex. 5. Slightly different figures are reflected in Debtor's Ex. 5. They are: $2,408.00—VA; $857.70—SSA; $429.00—SSA for daughter, for a total of $3,694.70.

8. Defendant's Ex. 5.

9. Defendant's Ex. 7.

10. Defendant's Ex. 6.

11. Defendant's Ex. 9.

12. Defendant's Ex. 10. Those expenses are as follows: mortgage—$1,071.87; home maintenance—$75.00; electricity—$265.00; heat (included in previous item); water/sewer/trash—$35.00; telephone—$120.00; transportation—$245.00; home insurance—$62.00; truck insurance—$119.00; groceries—$700.00; laundry/dry cleaning—$100.00; recreation, entertainment, newspapers, magazines—$40.00; medicine—$80.00; medical/dental—$125.00; clothing—$100.00; personal property taxes—$25.00; truck loan—$508.91; furniture loan—$150.00; charitable contributions—$20.00; internet—$22.00; school supplies/meal expenses for daughter—$50.00; personal items—$75.00; lawyer—$150.00; tires/truck maintenance—$50–$60.

13. Defendant's Ex. 12.

the loan. The borrower has up to 25 years to repay, after which any remaining balance on the loan is discharged. According to Ms. Schreiner, Debtor is eligible to consolidate through the Extended Repayment Plan option at an interest rate of 8.25% with monthly payments of $1,353.68 for a period of 30 years. Under the Graduated Repayment Plan, her payments would start at $1,238.78 and increase every two years thereafter for a period of 30 years until the loan was paid in full. Under the ICRP, based upon her adjusted gross income and family size, the amount of her current monthly payment would be $0. Debtor would also be eligible for deferments or forbearances during periods of hardship or unemployment. Debtor has not applied for the program.

## II. DISCUSSION

### A. Applicable Legal Principles

■ Under § 523(a)(8), certain student loans are nondischargeable unless repayment of the loan would impose an undue hardship on the debtor or her dependents. The burden of establishing undue hardship, by a preponderance of the evidence, is on the debtor. *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews),* 661 F.2d 702, 704 (8th Cir.1981); *Ford v. Student Loan Guarantee Found. of Arkansas (In re Ford),* 269 B.R. 673, 675 (8th Cir. BAP 2001). Unfortunately, the Code contains no definition of the phrase "undue hardship" and interpretation of the concept has been left to the courts. In this Circuit, the applicable standard is the "totality of the circumstances" test. *Long v. Educ. Credit Mgmt. Corp. (In re Long),* 322 F.3d 549, 554 (8th Cir.2003); *Andrews,* 661 F.2d at 704. In applying this approach, the courts are to consider: (1) the debtor's past, current and reasonably reliable future financial resources; (2) the reasonable necessary living expenses of

the debtor and the debtor's dependents; and (3) and the other relevant facts and circumstances unique to the particular case. *Long,* 322 F.3d at 554; *Ford,* 269 B.R. at 676. The principal inquiry is to determine whether "the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living"; if so, the indebtedness should not be discharged. *Long,* 322 F.3d at 554. The "totality of the circumstances" is obviously a very broad test, giving the Court considerable flexibility. As a result, courts in the Eighth Circuit have looked to a number of facts and circumstances to assisting them in making this determination including: (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness. *VerMaas v. Student Loans of North Dakota,* 302 B.R. 650, 656–57 (Bankr.D.Neb.2003); *Morris v. Univ. of Arkansas,* 277 B.R. 910, 914 (Bankr.W.D.Ark.2002).

### B. Analysis of the Totality of the Circumstances

### 1. Debtor's Past, Current and Future Financial Resources

■■ Although Debtor has substantial educational training and projected earning

capacity between $30,000 to $40,000, she has not been able to realize that level of income for a number of reasons. Her income in the years prior to the filing of this case was $888.00 (2001) and $3,485 (2002). Income earned in the year 2003 as of the date of the hearing on the Complaint, was $1,661.00. As a result of her husband's health and his need for constant attention, Debtor has not been able to secure a job either in the field for which she was educated (pastoral ministry) or in the complementary area of social work, for which she is also qualified and in which she has some previous experience. Although Debtor did have a previous position in the social work area, she was unable to retain it due to the demands of her husband's condition and interference caused by his occasionally erratic behavior. Her projection of income in the range of $30,000 to $40,000 was based on the assumption that she could co-pastor with her husband, an option no longer available to her as a result of his total and permanent disability. In addition, the evidence is that her pastoral training was for an American Baptist church and there are no such churches within 150 miles of her residence.[14] The only employment the Debtor has been able to obtain that offers the prospect of some income with the flexibility needed to permit her to attend to her husband's needs has been substitute teaching. As noted above, however, the amount she has been able to earn in that field has been minimal. While her husband's prognosis relating to his prostate cancer is unclear and the worst of the treatment regimen might be behind them, there is no evidence indicating that his numerous other medical conditions will improve and their attendant demands decline. The condition of the Debtor's spouse and the limits that places on her ability to earn are

factors this Court may take into consideration in making the undue hardship determination. *See Mulherin v. Sallie Mae Servicing Corp. (In re Mulherin)*, 297 B.R. 559, 565 (Bankr.N.D.Iowa 2003) ("having a disabled spouse or dependents may necessitate a greater commitment of time and money while limiting the debtor's realistic job opportunities.") In *In re Morgan*, 247 B.R. 776 (Bankr.E.D.Ark. 2000), the court, applying the totality of the circumstances test, held the debtor's student loan indebtedness dischargeable in part as a result of the limitations on debtor's ability to earn caused by her husband's disability and her need to care for him. The student loan creditor asserted that his condition did not prevent her from working outside the home. The court, however, found, as the debtor here argues, that that assertion did not "take into account that it is impossible to predict when [debtor's spouse] may require care on any given day." *Morgan*, 247 B.R. at 783. The evidence in this case demonstrates similar limits imposed on the debtor's ability to earn outside income to supplement the disability benefits received by her spouse and appreciably approve the household's monthly income.

Defendant introduced into evidence the HHS Poverty Guidelines inviting this Court to make a comparison between them and the household's combined income based on Debtor's spouse's disability payments and the income she has been able to earn from substitute teaching. Defendant argues that income is in excess of the Poverty Guidelines, which militates against a finding of undue hardship. The fact that the household income may not be at or below poverty guidelines does not, however, preclude a finding of undue hardship. *See, e.g., In re Powers*, 235 B.R. 894, 900

---

14. Debtor's Ex. 6.

(Bankr.W.D.Mo.1999) (listing poverty guidelines as one factor to consider; not controlling); *see also, e.g., In re Meling,* 263 B.R. 275, 280 (Bankr.N.D.Iowa 2001) (debtor's income just above poverty guidelines, but other factors considered lent to discharge of student loan debt). The household's expenses and other circumstances may be such that it would still lack the funds necessary to maintain a minimal standard of living if required to repay the student loan. The Court finds that to be the case here.

From Debtor's testimony on cross-examination regarding deposits shown on certain monthly bank statements, it appears that the gap between income and expenses may occasionally be bridged by a gift from their church. Obviously, however, this is not something to which the Debtor is entitled or on which she can rely and the evidence does not show that it has occurred with regularity.

 Finally, although it is appropriate to consider the Debtor's assets as well as her income in determining whether repayment of the student loan would impose an undue hardship, there is no evidence to suggest that this Debtor and her spouse have other assets that might be liquidated to pay the debt or any substantial part of it.

### 2. Debtor's Reasonable Necessary Living Expenses

With the $140 per month on average Debtor earns from substitute teaching and the disability payments received from the Veteran's Administration and Social Security Administration, the household's combined monthly income is $3,769.00. Monthly expenses, as indicated on Schedule J filed with the petition were listed at $3,892.00. In her answers to interrogatories and testimony at the time of trial, Debtor placed those expenses at $4,198.78. Even at their previously estimated level, the monthly expenses exceed the household's monthly income.

These figures included expenses attributable to the presence of their daughter in the household, which might be reduced if she leaves the home to go to school outside the area. If that happens, however, Debtor's husband testified the household loses the monthly payment now being made by the Social Security Administration for the daughter. Although the amount of expenses attributable to the daughter was not separately identified, it is reasonable to assume that this tradeoff would not be a positive one for the household's net income.

Defendant did not mount a challenge to any of the expenses as being unnecessary or unreasonable. The Court does not find any of them to be so. While it might be possible to reduce slightly certain of these expense items (e.g., the $120 monthly telephone expense) and while others may be discontinued after a time (e.g., payments to Debtor's counsel and the furniture company), these adjustments will still not give the Debtor sufficient net monthly income to pay this debt.

According to an amortization schedule introduced into evidence by the Debtor, payments on this debt over a 30–year period at 9% interest would require $1,423.00 a month,[15] an amount not available to Debtor based on current income and expenses and not likely to be available in the foreseeable future. Similar figures are suggested by Defendant's evidence. According to the affidavit of Ms. Schreiner, under the Extended Repayment Plan, Debtor's payments would be $1,353.68 per month for a period of 30 years, while under the Gradu-

15. Debtor's Ex. 8.

ated Repayment Plan, although her initial monthly payment would be in the lower sum of $1,238.78, it would increase every two years thereafter. With her present and reasonably anticipated future income and expenses, Debtor cannot make such payments.

### 3. Other Unique Circumstances

 In addition to the programs mentioned above, Debtor is eligible for the ICRP under which her payments on the consolidated loan would be based on her adjusted gross income. According to Ms. Schreiner's affidavit, based on her income in 2002, Debtor would not be required to make monthly payments on the loan. Her payment amount would be subject to re-evaluation each year she was in the program. Defendant argues that the availability of the ICRP means that repayment of the loan, based as it is on her income, cannot by definition constitute an undue hardship. The availability of the ICRP, however, is but one of the factors for the Court to consider in determining whether excepting the debt from discharge would impose an undue hardship on the Debtor. *Ford,* 269 B.R. at 677; *Mulherin,* 297 B.R. at 565; *In re Wilson,* 270 B.R. 290, 294–95 (Bankr.N.D.Iowa 2001). Similarly, although the Debtor admits having been aware of this option and not applying for participation, facts which trouble the Court and weigh against a finding of undue hardship, this too is but one factor to weigh in making the decision and is not itself determinative. *Korhonen v. Educ. Credit Mgmt. Corp. (In re Korhonen),* 296 B.R. 492, 496 (Bankr.D.Minn.2003).

 The Court must consider the consequences of Debtor's potential participation in the ICRP and the efficacy of that relief under the circumstances. In this case, the Debtor owes approximately $180,000, a staggering sum of money. Given the Debtor's past, present and likely future income and expenses, there is little doubt that she would have to be in the program for the full 25 years, still not repay the entire amount, then receive a discharge of the unpaid balance and face taxable income in that amount. At that point, the Debtor would be 78 years old. The age of the Debtor is a factor the Court may take into consideration in assessing whether repayment of the debt constitutes an undue hardship. *Ford,* 269 B.R. at 677; *In re Crowley,* 259 B.R. 361, 370 (Bankr. W.D.Mo.2001) (considering the debtor's age and physical impairments as "other relevant factors"); *In re Brown,* 249 B.R. 525, 527–28 (Bankr.W.D.Mo.2000). This Court agrees with the observation in *Brown* that requiring a debtor to participate in an extended repayment plan which significantly exceeds the debtor's working life constitutes an undue hardship. *Brown,* 249 B.R. at 527–28 ("the age of a debtor becomes a relevant circumstance to be considered by the court in making an undue hardship determination when the student loan lender proposes a 20–year repayment schedule in order to demonstrate that debtor can repay the student loan obligation. Requiring someone to repay a student loan under a repayment schedule that far exceeds one's average working life imposes an undue hardship on the debtor."). *See also, Faktor v. United States of America (In re Faktor),* 306 B.R. 256, 263–64 (Bankr.N.D.Iowa 2004) (debtor would be 76 years old at end of proposed 25–year repayment period). In a similar factual setting in *Ford,* the Eighth Circuit Bankruptcy Appellate Panel found that it was an undue hardship to require a 62–year–old debtor to participate in a 25–year repayment period pursuant to the ICRP. *Ford,* 269 B.R. at 677. For the same reasons, this Court finds it would be an undue hardship to deny discharge of this debt and force this Debtor to participate in such a plan. At the end of the repayment

period, the Debtor would be 78 years old, which takes her well beyond an expected working age. She would then face a discharge of the balance of the debt, which would be considered taxable income, potentially creating significant tax liabilities.

██ Another factor which this Court may take into consideration in determining whether repayment would constitute an undue hardship is the psychological and emotional impact of the Debtor's continuing liability for the repayment of such a large sum of money over such an extended period of time. *Reynolds v. Pennsylvania Higher Educ. Assistance Agency (In re Reynolds)*, 303 B.R. 823, 836–37 (Bankr. D.Minn.2004). The testimony and other evidence introduced at trial, convinced the Court that the emotional toll on the Debtor of dealing with her husband's numerous physical and emotional problems while attempting to pursue a career and supplement the family's monthly income in order to meet expenses has been substantial.[16] Those problems will only be compounded and exacerbated if the Debtor remains responsible for $180,000 in student loan debt, a sum which will increase with accruing interest and which ultimately may not be resolved for a quarter of a century.

Debtor did not file the bankruptcy proceeding immediately after consolidating the loans in 1997 or "on the eve of a lucrative career," *Faktor*, 306 B.R. at 264 (quoting *Andresen*, 232 B.R. at 130), but several years later and only after unsuccessfully attempting to retain substantial employment in the pastoral ministry or social work while dealing with her husband's deteriorating physical and emotional health.

Finally, while the student loan debt the Debtor seeks to discharge is a substantial portion of her total unsecured debt, Debt-or filed not just to obtain relief from her student loan obligations, but from significant other unsecured liabilities as well. Schedule F of Debtor's Schedules of Assets and Liabilities reveal an additional $44,316.30 of unsecured debt for which she had responsibility at the time she filed.

### III. CONCLUSION AND ORDER

The circumstances of this case present the Court with a close question and a difficult decision. The decision to discharge this debt as imposing an undue hardship on the Debtor is based on the confluence of the various individual factors cited. In a different context, the Court might weigh some of them differently. Of principal importance in this case are the amount of the debt, the Debtor's age, the likely length of the repayment period and the limitations imposed on the Debtor's ability to earn by her husband's physical and emotional conditions. In a different context, the Court might give more weight to the availability of the ICRP and a debtor's refusal to apply for participation in that program.

For all the reasons described above, this Court finds that repayment of the indebtedness to Defendant Educational Credit Management Corporation would impose an undue hardship on the Debtor. It is therefore

ORDERED that the Debtor be and is hereby granted a discharge of her indebtedness to Educational Credit Management Corporation pursuant to 11 U.S.C. § 523(a)(8).

---

16. Debtor's Ex. 6.