In re Mark Allen JESPERSON, Debtor.

Mark Allen Jesperson, Plaintiff,

v.

U.S. Department of Education; National Student Loan Program, Inc.; Account Control Technology, Inc.; United Student Aid Funds, Inc.; GC Services; General Revenue Corp.; Educational Resources Institute, Inc. (Teri); Arrow Financial Services LLC; Great Lakes Higher Education Guaranty Corp.; OSI Education Services, Inc.; Diversified Collection Services, Inc.; American Education Services (AES); Sallie Mae Servicing; NCO Financial Systems, Inc.; Hamline University; University Accounting Service, LLC; Lewis and Clark College; Windham Professionals, Inc.; JM Associates; Pioneer Credit Recovery, Inc.; USA Funds; Eduserve; Keycorp; Help Kansas; Chase Manhattan Bank, USA, et al., Defendants.

Bankruptcy No. 05–39651.
Adversary No. 06–3120.

United States Bankruptcy Court, D. Minnesota.

April 16, 2007.

**910**

Mark Allen Jesperson, Minneapolis, MN, pro se.

James C. MacGillis, Trepanier & MacGillis P.A., Michael D. Gordon, Briggs and Morgan, Henry T. Wang, Gary Plant Mooty Mooty & Bennett PA, Minneapolis, MN, David G. Ellis, Portland, OR, for Defendants.

## ORDER FOR JUDGMENT DETERMINING DISCHARGEABILITY

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came before the Court on February 12, 2007, for trial on the debtor's 11 U.S.C. § 523(a)(8) complaint against multiple student loan provider or assignee defendants. The debtor, Mark Allen Jesperson, appeared *pro se*. James C. McGillis appeared on behalf of Arrow Financial Services LLC (Arrow). Henry T. Wang and A.L. Brown appeared on behalf of Educational Credit Management Corporation (ECMC). At the conclusion of trial, the Court took the matter under advisement. Based upon all of the files, records and proceedings herein, the Court being now fully advised makes the following order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I. FINDINGS OF FACT

The debtor, Mark Allen Jesperson, is 43 years old and unmarried. He has two children, aged five years (Dylan Tyler) and nineteen months (Lucas Mac), from different relationships. By court order, Jesperson is required to pay $500 each month toward the support of Dylan. Jesperson expects in the near future, either as a result of stipulation or yet to be commenced litigation, to be responsible for $500 each month toward the support of Lucas as well. One of his children resides in Duluth with the custodial parent and Jesperson travels to Duluth on some weekends for visitation. Jesperson has no other dependents and suffers no physical impairments or limitations that could interfere with his ability to maintain employment. He is a recovering alcoholic, maintaining sobriety since October 1996, and attends several meetings each week in support of ongoing sobriety, but those are scheduled in evenings and weekends and offer no disruption to full-time employment.

At the time of trial, Jesperson's income and employment situation was brighter than it had ever been before. Since January 2007, he works at Spherion Professional Services, a temporary staffing agency providing, among other professional services, legal services. Jesperson earns $25 per hour and has recently been working 40 hours per week, grossing approximately $4,000 per month, or $48,000 per year. Jesperson has been working for Spherion on a large discovery project at Faegre and Benson, LLP in Minneapolis. The project at Faegre is expected to run three months and Jesperson may have the opportunity to work overtime as the project nears completion.

But, the optimum conditions enjoyed these past few months are not the usual for Jesperson. It took him an excessive period of time to complete his undergraduate education and obtain a Bachelor of Arts degree in English literature, attending school irregularly for only five of eleven consecutive years: University of Wisconsin at La Crosse from 1983 to 1984, College of St. Scholastica from 1987 to 1988 and a 1991 summer session, and University of Minnesota–Duluth from 1991 to 1994. During Jesperson's absences from undergraduate studies, he sought and received deferment and/or forbearance from his student loan lenders, and did not make any payments.

In 1995, Jesperson started law school at Hamline University School of Law. Jesperson experienced an alcoholic relapse in April 1996. In 1997, he transferred to Lewis and Clark School of Law and completed his legal education in the year 2000. In February 2002, Jesperson took and passed the Minnesota bar exam on his first attempt. He is a licensed Minnesota attorney and current in his CLE requirements. The Court has essentially no information regarding Jesperson's finances prior to the year 2002, other than the details of his student loans. He borrowed heavily to fund his undergraduate and legal education, made no payments, and the amount he owes has steadily grown as a result of capitalizing interest and no payments.

Jesperson's legal experience began with a judicial clerkship at the Superior Court in the Northern Mariana Islands from March 2002 to January 2003. He left that position prematurely and without replacement employment purportedly because his then-girlfriend falsely reported to him that she was in ill health. Jesperson's second legal job similarly ended after a short time. He worked in Kotzebue, Alaska, as a legal services attorney from August 2003 to March 2004, leaving because the living conditions were harsh and reportedly because his supervisor was drinking on the job. Next, Jesperson operated a solo law practice for approximately six months in Grand Marais, Minnesota, during 2004. He had just two clients: one relative and one friend. Intermittently during 2005 and 2006, Jesperson worked attorney temp jobs through staffing agencies such as Kelly Services, Inc., and Spherion. He left Kelly over a dispute about one shift of holiday pay and inflexible hours. In between jobs, Jesperson sometimes obtained work as a painter.

While at the time of trial Jesperson had not cast aside his most recent employment, with Spherion, he nevertheless has a history of employment retention difficulty. For whatever reasons, he quits after only a short time. In spite of his aspirations, he has little hope of obtaining legal employment other than as a temp. While his employment history does not openly demonstrate substantive ineptitude, his record of work experience is besmirched by a patent lack of ambition, cooperation and commitment. His present wage at Spherion reflects the minimum legal educational qualifications necessary for the assignment, but is not indicative of a rising legal career. Indeed, since he graduated from law school, Jesperson has essentially been downwardly mobile—from arguably substantive positions (fleeting and increasingly brief in duration) which could launch a solid legal career, to an inactive solo practice, to temp work—and his history is spattered with non-legal or no employment.

Jesperson claims monthly expenses, once he has his own housing and is no longer renting the basement of his brother's home for $500 per month, as follows:

| | |
|---|---|
| rent and utilities | $ 1,000.00 |
| child support—Dylan | $ 500.00 |
| child support—Lucas | $ 500.00 |
| child support arrears (both children) | $ 500.00 |
| clothing for children | $ 30.00 |
| cigarettes | $ 125.00 |
| food | $ 325.00 |
| car maintenance | $ 41.66 |
| gasoline | $ 250.00 |
| parking | $ 140.00 |
| TOTAL | $ 3,411.66 |

The defendants make much out of Jesperson's claimed expenses, especially because Jesperson has modified the figures more than once, increasing the bottom line each time. However, it is plain that the monthly expenses he initially scheduled ($1,315) were so inaccurately low as to be ignorant, if not utterly careless. The expenses he

currently projects are actually reasonable, with just a few exceptions. First, the monthly clothing expense for the children is something that presumably falls within the scope of Jesperson's general monthly support obligations for the children. Second, it is questionable whether cigarettes constitute a legitimate expense of a basic needs budget. Finally, the child support arrears are not supported by the record. Jesperson is behind on court ordered payments for Dylan, but no support has yet been determined or ordered for Lucas, so it cannot reasonably be said that there are any arrears with respect to Lucas. Moreover, Jesperson is not so behind with payments toward Dylan's support that $500 each month is necessary to catch up—at least not long term.

There is also, however, at least one underestimated item in Jesperson's anticipated expenses: transportation. At present he drives a 1988 Dodge pickup with approximately 210,000 miles. He may be able to use public transportation instead of driving, depending on where he ultimately obtains housing, and that would also eliminate the substantial parking and fuel expenses. Nevertheless, it is not wholly unreasonable to assume that maintaining a vehicle may be marginally more or less cost effective due to Jesperson's regular travel to Duluth for visitation with one of his sons. Moreover, Jesperson attends several meetings during evenings and weekends each week in order to maintain sobriety, and he will require transportation to facilitate visitation somewhere with his other son as well. Assuming Jesperson maintains his current 1988 truck, his expenses lack an item for insurance and the maintenance item is surely underestimated. In reality, Jesperson will likely need to replace his current vehicle in the relatively near future, in all probability adding a car payment and possibly increased insurance to his fundamental expenses.

The remaining expenses are undeniably reasonable. While Jesperson is paying just $500 per month to his brother to live in the basement right now, an average rent and utilities package of $1,000 per month out in the real urban housing marketplace is not inflated. Likewise, the claimed food and fuel expenses are not extraordinary. Accordingly, the Court finds that Jesperson's basic necessary monthly expenses are presently at least $2,857 (having conservatively added $100 for auto insurance and additional vehicle maintenance, and having subtracted child support arrears, clothing for children, and cigarettes).

But, Jesperson's actual expenses in the near future and ongoing will more likely be approximately $3,107 (conservatively adding $250 for a car payment). If the Court were to strike all vehicle expenses and in essence limit Jesperson (financially, for purposes of this undue hardship determination) to the use of public transportation exclusively, the deduction from $3,107 would be approximately $782 (insurance, maintenance, gasoline, parking, car payment) and a public transportation expense would be substituted. A monthly public transportation expense, with so much necessary daily travel, plus regular trips to and from Duluth, while speculative, would presumably be less than half the expense of owning a vehicle, or at least $300, for a total monthly expense budget for present purposes of $2,625. That said, Jesperson apparently has no meaningful savings or retirement funds, no other assets of more than nominal value, and he claimed no expenses for medical or dental out-of-pocket costs or insurance premiums. The Court will not supplement the bare evidentiary record regarding these variable but certain elementary budget items, but notes the obvious and paramount reality such factors present in every person's life sooner or later.

Jesperson's ordinary expenses under any plausible calculation, especially now that he has child support obligations, far exceed his historical earning capacity. His adjusted gross income was $13,207 in the year 2003, $14,828 in 2004, and $21,584 in 2005. His estimated 2006 adjusted gross income was approximately $13,692. At the moment, however, Jesperson's net monthly income from his temporary employment at Spherion is actually $2,680, based on a presumed income tax bracket of 33%. The present time, since January of this year, is an unprecedented period of pecuniary abundance for Jesperson. At trial he acknowledged that he had never before earned $48,000 in any year of his life. Unfortunately, he also admitted that he did not ever expect to gross that much, either. Realistically, based on the concrete past, the expectation that Jesperson maintain or increase his current rate of pay is one part rational to two parts imagination. Nevertheless, he has demonstrated the possibility.

As of January 30, 2007, the balance owed by Jesperson on the eighteen unconsolidated loans held by ECMC was $304,463.62, consisting of $197,837.24 in principal, $58,463.09 in collection costs, and $48,163.29 in accrued and unpaid interest. As of the same date, the balance owed by Jesperson on the seven Arrow Loans was $58,755.26. Total interest on six of the seven Arrow loans accrues at the rate of $10.48 per diem, or more than $300 each month. Interest information on the student loan most recently acquired by Arrow was not provided, nor was calculable payment information. The Arrow loans are student loans issued by private agencies or entities, and are not eligible for consolidation or the Income Contingent Repayment Program (ICRP) under the federal guaranteed student loan program.

Under the ICRP, if Jesperson consolidated his federally guaranteed student loans held by ECMC, the required monthly payment amount would be calculated based only on his annual adjusted gross income (AGI), and the outstanding loan balance is entirely irrelevant. The ICRP annual payment amount is equal to 20% of the difference between the borrower's AGI and the poverty level for the borrower's family size. That amount is then divided by twelve to arrive at the required monthly payment. If a borrower is a non-custodial parent but still contributes support to his children, he may write a letter of special circumstances to the Department of Education to claim an increased family size (as opposed to what is reported on the borrower's tax return).

Based on Jesperson's 2006 AGI, his 2007 ICRP payments would be $58 per month for a family size of one, $5 per month based on a family size of two, or zero based on a family size of three. Assuming Jesperson continues to work for Spherion or elsewhere at his earning rate and achieves an AGI for 2007 of $48,000, his 2008 monthly ICRP payments would be approximately $629 based on a family size of one, $572 based on a family size of two, or $514 based on a family size of three.

Forbearance and deferment periods of up to three years are available under the ICRP in each of three different reason categories: unemployment, hardship, or disability. An administrative discharge is also available in cases of permanent disability. After twenty-five years of participation in the ICRP, any remaining unpaid balance is "canceled" by the Department of Education. The IRS views such cancellation as a taxable event, but apparently only if the taxpayer is solvent at the time, meaning having assets of a value in excess of the canceled amount. The ICRP does not waive any fees or collection costs accrued, and interest continues to accrue

during the up to twenty-five year term of the ICRP.

## II. DISCUSSION

Section 523(a)(8) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose undue hardship on the debtor and debtor's dependents.

*See* 11 U.S.C. § 523(a)(8).

 This Court must apply the "totality of the circumstances" test to determine undue hardship as set forth by the Court of Appeals for the Eighth Circuit in *In re Long,* 322 F.3d 549, 554 (8th Cir.2003). *See In re Reynolds,* 425 F.3d 526, 529 (8th Cir.2005). "Under that test, the court considers (1) the debtor's past, present and future financial resources, (2) the debtor's reasonable and necessary living expenses, and (3) any other relevant circumstances." *Id.,* citing *Long,* 322 F.3d at 554. "The … burden of proving undue hardship lay with" the debtor by a preponderance of the evidence. *Id.*

 "[T]he availability of the ICRP is 'but one factor to be considered in determining undue hardship, but it is not determinative.' " *See In re Lee,* 352 B.R. 91, 95 (8th Cir. BAP (Ark.) 2006), citing *In re Korhonen,* 296 B.R. 492, 496 (Bankr. D.Minn.2003); *In re Thomsen,* 234 B.R. 506, 509–10 (Bankr.D.Mont.1999). "Placing too much weight on the ICRP would

have the effect in many cases of displacing the individualized determination of undue hardship mandated by Congress in § 523(a)(8) [because] the payments on a student loan will almost always be affordable, i.e., not impose an undue hardship on a Debtor." *Lee,* 352 B.R. at 95–96. "[T]he ICRP essentially mitigates some of the courts' need to look at future resources, because if the debtor does not have the money to pay, the debtor will not be required to pay." *Id.* at 96. "But the Debtor's current and prospective ability to pay, while important, is not the only consideration under the totality of circumstances test." *Id.,* citing *In re Reynolds,* 425 F.3d at 533–34.

 "[A] key difference between the ICRP and the undue hardship inquiry under § 523(a)(8) … is that they employ different standards for measuring a debtor's ability to pay." *Lee,* 352 B.R. at 96. "Under the ICRP, a debtor is presumed to have the ability to pay 20% of the difference between her adjusted gross income and the poverty level for her family size, or the amount the debtor would pay if the debt were repaid in twelve years, whichever is less." *Id.* "In contrast, a bankruptcy court engages in a case-by-case analysis of a debtor's income in relation to her reasonable expenses," *id.,* and also considers any other factors relevant to whether excepting the student loan debt from discharge constitutes an undue hardship upon the debtor and dependents.

Moreover, as the Bankruptcy Appellate Panel noted in *Lee,* "Congress did not include a mathematical formula for determining undue hardship under § 523(a)(8) even in the most recent amendments to the bankruptcy code, which did enact a mathematical formula for determining an above-median income chapter 13 debtor's disposable income." *Id.* at n. 13, citing 11 U.S.C. § 1325(b)(3) as amended by the

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. In other words, if the ICRP is intended to supplant the judicial process under § 523(a)(8), serve as the sole and final resort for financially distressed federal student loan borrowers, and entirely eliminate possible dischargeability of student loan debt, then Congress may so remake the law and repeal § 523(a)(8). *See generally, Limkemann v. U.S. Department of Education,* 314 B.R. 190, 196 (Bankr.N.D.Iowa 2004); *In re Durrani,* 311 B.R. 496, 508–09 (Bankr. N.D.Ill.2004); *Korhonen,* 296 B.R. at 496 (Bankr.D.Minn.2003); *In re Johnson,* 299 B.R. 676, 682 (Bankr.M.D.Ga.2003); *Newman v. ECMC,* 304 B.R. 188 (Bankr. E.D.Pa.2002). To date though, § 523(a)(8) remains effective, even as modified by BAPCPA 2005. The ICRP is but one of the totality of circumstances material to the § 523(a)(8) inquiry.

■ "[T]he availability and terms of the ICRP should not be given undue weight under the totality of circumstances analysis because it serves a fundamentally different purpose than the discharge provisions (and exceptions thereto) of the Bankruptcy Code." *Lee,* 352 B.R. at 96. "A survey of the legislative history behind legislation related to the ICRP indicates that its primary goal is to assist borrowers in avoiding default." *Id.,* citing S. Rep. 102–447, at 371–72 (1992); H. Rep. 103–111, at 158 (1993); H. Rep. 109–231, at 141 (2005). "In contrast, the Bankruptcy Code serves to provide a fresh start to 'honest but unfortunate debtors,' most of whom have already defaulted on their obligations (including student loans)." *Lee,*

352 B.R. at 96, citing *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

■ "The ICRP provides temporary relief from the burden of a student loan, but it does not offer a fresh start." *Lee,* 352 B.R. at 97. "Some aspects of the ICRP might even be viewed as inimical to the goals of the fresh start because the ICRP allows for negative amortization of the student loan debt and a potentially significant tax bill if the student loan is ultimately forgiven after 25 years." *Id.* "Section 523(a)(8) evidences Congress's intent that student loans should be more difficult to discharge than general unsecured debts, but it also provides an avenue for obtaining a discharge of those debts." *Id.* "[T]he ICRP cannot be allowed to foreclose that avenue." *Id.*

■ "[A] student loan obligation cancelled by the Secretary of Education must be recognized and treated as taxable income by the debtor." *See In re Gregoryk,* 2001 WL 1891469 (Bankr.D.N.D.2001), citing *Thomsen v. Dept. of Education (In re Thomsen),* 234 B.R. 506, 512–14 (Bankr. D.Mont.1999). "Recognizing the large potential income tax burden that could result from the cancellation of a large student loan obligation upon which interest has accrued for twenty-five years, [ ] the better result is to discharge the Debtors' educational loan debt, which they have no prospect of ever repaying, now and give the Debtors the benefit of a fresh start." *Id.*[1]

---

1. *But see In re Bray,* 332 B.R. 186 (Bankr. W.D.Mo.2005) (potential tax implications are too speculative to consider). "First, pursuant to 26 U.S.C. § 108(a)(1)(B), Debtor would only incur discharge of indebtedness income to the extent that the discharge renders him solvent, a result which is, at this point, impossible to predict." *Id.* "In addition, offers in compromise options are available to the Debtor and the IRS has the authority to forgive tax indebtedness if it doubts its collectibility." *Id.,* citing *In re Rose,* 227 B.R. 518, 525–526 (W.D.Mo.1998); *ECMC v. Stanley,* 300 B.R. 813, 818 n. 8 (N.D.Fla.2003); *Archibald,* 280 B.R. 222, 228 (Bankr.S.D.Ind.2002).

All that said, as a factor relevant to the determination in almost all § 523(a)(8) cases, the ICRP deserves genuine judicial attention. First, it is a formulaic income based payment calculator, including required payments as low as nothing at all if a debtor's income falls to a certain low level. Second, however, it is a long-term debt with long-term consequences. Depending on a debtor's situation, the ICRP may saddle a debtor with a poor-credit burden far into the future,[2] as well as a permanent negative amortization, and eventually potential forgiveness with possible derivative income tax liability. *Lee*, 352 B.R. at 96, citing *www.ed.gov/offices/ OSFAP/DirectLoan/RepayCalc/dlindex2. html* (Department of Education website stating, "If you haven't fully repaid your loans after 25 years under this plan, the unpaid portion will be discharged. You will, however, have to pay taxes on the amount that is discharged.").

 "The age of the Debtor is a factor the Court may take into consideration in assessing whether repayment of the debt constitutes an undue hardship." *In re Fahrer*, 308 B.R. 27, 35 (Bankr. W.D.Mo.2004) (citations omitted). "[R]equiring a debtor to participate in an extended repayment plan which significantly exceeds the debtor's working life constitutes an undue hardship." *Fahrer*, 308 B.R. at 35, citing *In re Brown*, 249 B.R. 525, 527–28 (Bankr.W.D.Mo.2000); *Faktor v. United States of America (In re Fak-*

*tor)*, 306 B.R. 256, 263–64 (Bankr. N.D.Iowa 2004); *In re Ford*, 269 B.R. 673, 677 (8th Cir. BAP (Ark.) 2001). *But see In re Winsborough*, 341 B.R. 14 (Bankr. W.D.Mo.2006) (mere fact debtor is near retirement age does not mean debt should be discharged).

 In this case, the defendants suggest that the issue is whether an extremely large amount of student loan debt alone constitutes undue hardship for purposes of dischargeability, regardless of the debtor's resources. The Court does not see the inquiry in the same light. While it is tempting to attach significance to Jesperson's shockingly immense and ever increasing $364,000 student loan debt, it is not the legally relevant perspective. On the contrary, the question is essentially whether a certain debtor can afford to repay that debtor's student loans, whatever the amount, while still funding a fundamentally ordinary needs-based existence for himself and his dependents. Jesperson cannot fund an ordinary existence for himself, including his child support obligations,[3] and also fund repayment of his student loans.

Assuming he maintains his current income, which this Court views as a largely specious position, and assuming the lowest possible reasonable calculation of his ordinary and necessary expenses, Jesperson will have an approximate monthly surplus of $55 ($2,680 net monthly income less $2,625 minimal basic expenses), if he does

2. *But see In re Bott*, 324 B.R. 771, 777–778 (Bankr.D.Mo.2005) (debtor's principal concern for not participating in ICRP being that her student loan debt would impact [sic] her credit rating and prevent her from obtaining future credit for a home and car illustrates lack of good faith in pursuing undue hardship discharge).

3. Arrow argues: "That [Jesperson] has two children does not distinguish him or his situation from thousands of other student loan

creditors that struggle with making financial choices between family and personal obligations." The Court finds unsound the proposition that a debtor ordered to pay child support, or who stipulates to an order of child support in lieu of litigating the determination, has a choice regarding whether to pay the child support over other obligations. Contrast between family obligations and personal obligations is arguably a distinction without a difference.

not first apply it to unfunded health care expenses. He will only be able to look forward to building a nest egg if his income should increase substantially over the years as he ages toward retirement, and then only if his health care is otherwise provided.

Under the ICRP, based on his current income and a family size of three, Jesperson would be required to make monthly payments of $514 against his ECMC student loans: plainly not feasible with an unreliable surplus of at best only $55. Similarly, the interest alone on most of the Arrow loans together accrues at more than $10 per diem. It is clear that Jesperson cannot repay any of those loans either, much less in addition to the ECMC loans, without enduring undue hardship.

In fact, over the course of 25 years the debtor will never be able to make a single payment actually against the ECMC debt. Even if Jesperson could sustain a payment of $514.00 per month, the accrual of interest is $2,030.00 during the first month. Assuming that the deficiency of $1,516 for the first month and subsequent deficiencies are added to the principal, the debt by the end of the first year will have grown to $323,374.09, with application of an interest rate of 8%, the applicable rate. Here is how the debt grows over the 25 year period:

| Payment Number | Interest Pmt. Req. | Interest Payment | Balance | |
|---|---|---|---|---|
| | | | $ 304,500.00 | |
| 12 | $ 2,144.95 | $514 | $ 323,374.09 | 1yr |
| 24 | $ 2,280.32 | $514 | $ 343,814.72 | 2yr |
| 36 | $ 2,426.93 | $514 | $ 365,951.91 | 3yr |
| 48 | $ 2,585.70 | $514 | $ 389,926.47 | 4yr |
| 60 | $ 2,757.65 | $514 | $ 415,890.91 | 5yr |
| 72 | $ 2,943.87 | $514 | $ 444,010.39 | 6yr |
| 84 | $ 3,145.55 | $514 | $ 474,463.77 | 7yr |
| 96 | $ 3,363.97 | $514 | $ 507,444.77 | 8yr |
| 108 | $ 3,600.51 | $514 | $ 543,163.18 | 9yr |
| 120 | $ 3,856.69 | $514 | $ 581,846.19 | 10yr |
| 132 | $ 4,134.13 | $514 | $ 623,739.87 | 11yr |
| 144 | $ 4,434.60 | $514 | $ 669,110.71 | 12yr |
| 156 | $ 4,760.01 | $514 | $ 718,247.31 | 13yr |
| 168 | $ 5,112.43 | $514 | $ 771,462.22 | 14yr |
| 180 | $ 5,494.09 | $514 | $ 829,093.94 | 15yr |
| 192 | $ 5,907.44 | $514 | $ 891,509.07 | 16yr |
| 204 | $ 6,355.09 | $514 | $ 959,104.62 | 17yr |
| 216 | $ 6,839.90 | $514 | $1,032,310.57 | 18yr |
| 228 | $ 7,364.94 | $514 | $1,111,592.58 | 19yr |
| 240 | $ 7,933.57 | $514 | $1,197,454.95 | 20yr |
| 252 | $ 8,549.39 | $514 | $1,290,443.86 | 21yr |
| 264 | $ 9,216.32 | $514 | $1,391,150.80 | 22yr |
| 276 | $ 9,938.61 | $514 | $1,500,216.37 | 23yr |
| 288 | $10,720.85 | $514 | $1,618,334.33 | 24yr |
| 300 | $11,568.01 | $514 | $1,746,256.01 | 25yr |

If Jesperson's income decreases to more familiar levels such as his AGI for 2006, then his monthly ICRP payment on his ECMC debt would be between zero and approximately $58. But, though Jesperson's income might so fall dramatically, his indispensable expenses would remain fixed or increase as already expected. His current $55 surplus (under circumstances of an income more than three times his 2006 AGI) would deteriorate into a desperate monthly deficit without a remedy. Based on Jesperson's income and expenses, under a formulation generous in establishing income and modest with respect to expenses, there is no scenario within which he will be able to make even the smallest actual payment toward any of his student loans.[4]

A zero payment or such a small payment as $58 each month is appealing, and the temptation to provide some relief to the defendants is strong. But a zero payment is not a payment at all. It is merely another form of deferment during which time the interest continues to accrue and capitalize with no payment toward principal or fees. It is a process that perpetuates the liability and increases the debt. A

4. There is, theoretically, the possibility that Jesperson's current income will drastically increase, and that is the only road that could lead to a surplus adequate to make even a very small but actual monthly payment against any of his student loan debt. However, while the Court does not wish to be dis-couraging, that road in this case is unrealistically long and the desired destination elusive. The evidence indicates that Jesperson's present income is a relatively major achievement, and but for periodic marginal increases, the Court is loath to place the bar much higher.

payment yielding negative amortization is the same result.

Even a nominal monthly payment such as $5 or $58, which in fact Jesperson cannot reasonably pay, would fail to inhibit the growth of the unpaid balance of most of the loans at issue here. In this case, but for an entirely fanciful windfall of hugely enlarged income, Jesperson has only to look forward to a quarter century of negative amortization, the burden of poor credit and a cash-only lifestyle due to a heavy debt to income ratio, until finally at the age of 68 he would be released (but only from the ECMC loans he could consolidate under the ICRP, not the Arrow loans), and then have a real opportunity for a fresh start. In short, without the relief of discharge now, the debtor would, in effect, be sentenced to 25 years in a debtors' prison without walls.

Importantly, the lengthy and burdensome participation of the debtor in the ICRP, in this particular case under the totality of these unique circumstances, would result in little or no actual repayment relief to the lenders and loan guarantors in any event.

The defendants argue that Jesperson could work overtime or obtain a second job to increase his income and contribute to repayment of his student loan debt without experiencing undue hardship. In some cases, that may be one or both reasonable and useful. In this case, Jesperson would have to work more hours than possible and at a high rate of pay such as his current rate at Spherion in order to produce the surplus necessary to make $514 ICRP payments to ECMC and or payments against his Arrow debts. Moreover, he attends multiple meetings each week in the evenings in order to maintain his sobriety. He has two children with different mothers therefore requiring two different visitation events, at least one of which is out of town. Finally, as described earlier, Jesperson's expenses under any of the explored formulations lacks funding for medical and dental costs or premiums. All in all, he has responsibilities to occupy most awake hours beyond a full-time work shift, not including time spent en route. He may indeed work overtime or an extra job, but not to the extent required to create a surplus adequate to make meaningful repayment toward his student loans.

As a last resort the defendants urge the Court to examine each of the twenty-five not-consolidated student loans at issue here separately, and to except from discharge only the individual loan or loans the repayment of which would not impose an undue hardship. While there is support for that process,[5] the Court need not address it here because Jesperson's cur-

---

5. "[T]he bankruptcy court is required to apply § 523(a)(8) and the 'Andrews test' to each of the debtor's student loans separately." *See In re Cheney,* 280 B.R. 648, 666 (N.D.Iowa 2002), citing *In re Andresen,* 232 B.R. 127, 137 (8th Cir. BAP (Neb.) 1999) *abrogated on other grounds by Long,* 322 F.3d at 553–554. "[Section] 523(a)(8) does not authorize a 'partial discharge' or other revision of a debtor's individual educational loan obligations, in the sense of 'a single student loan . . . divided into discharged and excepted portions.'" *See In re Lieberman,* 2004 WL 555245 (Bankr. D.Minn.2004), citing *Andresen,* 232 B.R. at 135–136. "In *Andresen,* the Bankruptcy Appellate Panel gave every last bit of substantive analysis to support this construction of § 523(a)(8); then it declined to actually announce a holding to that effect." *Lieberman,* 2004 WL 555245 at n. 13. "It found that the dispute before it had actually been resolved on the trial level by applying § 523(a)(8) to each of the several discrete, unconsolidated educational loan debts owing by the debtor before it." *Id.* "In an exercise of judicial restraint, it then opted to agree with that approach rather than rule on the lender's 'partial discharge' argument." *Id.,* citing *Andresen,* 232 B.R. at 136. *See also In re Reynolds,* 303 B.R. 823, 838 at n. 18 (Bankr. D.Minn.2004); *In re VerMaas,* 302 B.R. 650, 660 (Bankr.D.Neb.2003).

rent surplus is at best a trifle and more likely a fiction. The $55 purported surplus is based on a best-case scenario income presently existing within an officially temporary capacity and an overly minimized essentials-only expense schedule. In actuality, Jesperson's educational and employment history demonstrates a pattern of unreliable, erratic behavior and poor earning capacity. His expenses are as certain and underestimated as his income is undependable and overestimated. There is no meaningful surplus to be found here.

 "Congress excepted student loans from discharge in order to close what it deemed a loophole in the student loan program." *Long*, 322 F.3d at 554, citing Raymond L. Woodcock, Burden of Proof, Undue Hardship, and Other Arguments for the Student Debtor Under 11 U.S.C. § 523(A)(8)(B), J.C. & U.L. 377, 381–84 (1998); *Johnson v. Missouri Baptist Coll. (In re Johnson)*, 218 B.R. 449, 451–54 (8th Cir. BAP (Mo.) 1998). "The policy of this provision was clear." *Long*, 322 F.3d at 554. "Congress intended to prevent recent graduates who were beginning lucrative careers and wanted to escape their student loan obligation from doing so." *Id.* "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt—while still allowing for a minimal standard of living—then the debt should not be discharged." *Long*, 322 F.3d at 554–555.

While Jesperson is educated and in basically good health, he remains a person with narrowly limited resources and restricted opportunities. Obviously he has found academic and professional success thus far excessively challenging. His basic expenses are average, including support obligations for two young children for whom he must provide support for many years ahead. He is not a recent graduate, and there is almost certainly not a lucrative career in his future. Jesperson's reasonable future financial resources will not produce disposable income sufficient to meaningfully address any of his student loan debt. For all these reasons, it is manifest that excepting Jesperson's student loans from discharge would impose undue hardship.

### III. DISPOSITION

IT IS HEREBY ORDERED:

1. Mark Allen Jesperson's student loan debts constitute an undue hardship for purposes of 11 U.S.C. § 523(a)(8) and are accordingly discharged as part of the general discharge entered in Jesperson's main bankruptcy case 05–39651.

LET JUDGMENT BE ENTERED ACCORDINGLY.