# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 07-3888

———————

|  |  |  |
|---|---|---|
| Educational Credit Management Corporation, | * * * | |
| Claimant - Appellant, | * * | Appeal from the United States District Court for the |
| v. | * | District of Minnesota. |
| | * | |
| Mark Allen Jesperson, | * * | |
| Debtor - Appellee. | * | |

———————

Submitted: October 17, 2008
Filed: July 8, 2009

———————

Before LOKEN, Chief Judge, BYE and SMITH, Circuit Judges.

———————

LOKEN, Chief Judge.

Mark Allen Jesperson, a recently licensed Minnesota attorney, petitioned for Chapter 7 bankruptcy relief in October 2005 and commenced this core proceeding against his student loan creditors, seeking an undue hardship discharge of substantial student loan debts, which would otherwise be non-dischargeable under 11 U.S.C. § 523(a)(8). The bankruptcy court concluded that Jesperson's student loan debts "constitute an undue hardship . . . and are accordingly discharged." In re Jesperson, 366 B.R. 908, 919 (Bankr. D. Minn. 2007). The district court affirmed. Creditor Educational Credit Management Corporation (ECMC) appeals this final judgment. The issue, as we perceive it, is whether a recent law school graduate who is reasonably

likely to be able to make significant debt repayments in the foreseeable future, and who qualifies for the Department of Education's twenty-five year Income Contingent Repayment Plan, is entitled to an undue hardship discharge because, as the bankruptcy court put it, it is unlikely that his "shockingly immense" student loan debts will be totally repaid and therefore, "without the relief of discharge now, the debtor would, in effect, be sentenced to 25 years in a debtors' prison without walls."  366 B.R. at 916, 918.  Reviewing the determination of undue hardship *de novo*, we reverse.  See In re Long, 322 F.3d 549, 553 (8th Cir. 2003) (standard of review).

## I.

Section 523(a)(8) of the Bankruptcy Code provides that debts for educational loans "made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit," may not be discharged unless "excepting such  debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."  Federal government student loan programs began in 1958.  In 1973, to curb perceived abuses, the Commission on the Bankruptcy Laws of the United States recommended that "educational loans be nondischargeable unless the first payment falls due more than five years prior to the petition."  H.R. Doc. No. 93-137 (1973), reprinted in B App. Collier on Bankruptcy, pt. 4(c), at 4-432 (15th rev. ed. 2008).  Congress enacted this recommendation in the Bankruptcy Reform Act of 1978.  Pub. L. No. 95-598, § 523(a)(8), 92 Stat. 2549, 2591 (1978), codified at 11 U.S.C. § 523(a)(8).  In 1990, Congress lengthened from five to seven years the period beyond which government-assisted student loans became automatically dischargeable.  Pub. L. No. 101-647, § 3621, 104 Stat. 4789, 4964-65 (1990), amending 11 U.S.C. § 523(a)(8)(A).  Then, in the Higher Education Amendments of 1998, Congress eliminated this time limitation, making "undue hardship" the only exception to non-dischargeability.  Pub. L. No. 105-244, § 971(a), 112 Stat. 1581, 1837 (1998).

We apply a totality-of-the-circumstances test in determining undue hardship under § 523(a)(8).[1]  Reviewing courts must consider the debtor's past, present, and reasonably reliable future financial resources, the debtor's reasonable and necessary living expenses, and "any other relevant facts and circumstances."  Long, 322 F.3d at 554.  The debtor has the burden of proving undue hardship by a preponderance of the evidence.  The burden is rigorous.  "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt - while still allowing for a minimal standard of living - then the debt should not be discharged."  Id. at 554-55.  Undue hardship "is a question of law, which we review de novo.  Subsidiary findings of fact on which the legal conclusion is based are reviewed for clear error."  In re Reynolds, 425 F.3d 526, 531 (8th Cir. 2005).

## II.

When this case was tried in February 2007, Jesperson was forty-three years old, in good health, and unmarried, with two sons from different relationships living with their mothers.  He began college in 1983, attended three schools over the next eleven years, and graduated from the University of Minnesota-Duluth in 1994.  He began law school in 1996, changed schools in 1997, completed his legal education in 2000, and passed the bar on his first attempt in February 2002.  At the time of trial, he owed

---

[1]Most circuits apply a three-part undue hardship test adopted in Brunner v. N.Y. State Higher Educ. Servs. Corp., 831 F.2d 395, 396 (2d Cir. 1987), under which the debtor must show (i) based on current income and expenses, he cannot maintain a minimal standard of living if required to repay student loan debts, (ii) this state of affairs will persist for a significant portion of the repayment period, and (iii) good faith repayment efforts.  Failure to prove any factor renders the debt non-dischargeable. "We prefer a less restrictive approach to the 'undue hardship' inquiry." Long, 322 F.3d at 554.  Some circuits have adhered to or adopted the Brunner test after considering our approach.  See Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1308-09 (10th Cir. 2004).  Only our court en banc or the Supreme Court could resolve this conflict, which may not be that significant.

ECMC $304,463.62 in principal, interest, and collection costs on eighteen student loans, and he owed Arrow Financial Services $58,755.26 on seven other student loans. He has never repaid any part of any loan.

The bankruptcy court found that Jesperson's "record of work experience is besmirched by a patent lack of ambition, cooperation and commitment." 366 B.R. at 911. After passing the bar, Jesperson was hired as a judicial clerk on the island of Saipan, then as an attorney with Alaska Legal Services, and then as a legal temporary with Kelly Services, Inc. He quit each job for a variety of personal reasons. Several months after leaving Kelly, he began work for another placement agency, Spherion Professional Services. At the time of trial, he was working on a project that paid $25 an hour. He was one of only ten lawyers Spherion retained out of a pool of sixty. He testified at trial:

> Q    It's true, Mr. Jesperson, that you think this debt should just go away, isn't that true:
>
> A    Yes.
>
> Q    And even if you had, Mr. Jesperson, an extra $500 per month, you don't think you should have to put that towards your student loans, do you?
>
> A    No.

Based on gross monthly income of $4,000, Jesperson stipulated that he was likely in the 33% combined federal and state income tax bracket. Using this inflated tax rate, the bankruptcy court found that his current after-tax income was $2680 per month. Use of the inflated tax rate was clear error. Arguably, Jesperson's failure to make a good faith estimate of his applicable tax rate means that he failed to prove undue hardship. Alternatively, a reasonable estimate of the combined rate for gross income of $48,000 would be 17.5%, producing after-tax net income of $3300 per

month rather than $2680 per month.  The bankruptcy court estimated Jesperson's "basic necessary monthly expenses" as $2857 -- $1000 for housing, $1000 for child support, $325 for food, $142 for auto maintenance and insurance, $250 for gasoline, and $140 for parking.  366 B.R. at 912.  However, Jesperson testified at trial that he lived rent free with his brother, expected to pay his brother $500 per month, and was looking for an apartment.  Estimating his basic necessary monthly housing expense at $1000 per month, rather than $500, was clear error.  A debtor making a good faith effort to repay loans would continue to live with his brother to save money.  While Jesperson is under a court order to pay $500 per month to support his elder son, he testified he has never made a full monthly payment.  He does not owe child support for the younger son, but occasionally pays $200-$400 to the mother of this son, and feels an obligation to pay $500 to support each child.

Based on these estimates, the bankruptcy court concluded that "Jesperson's current surplus is at best a trifle and more likely a fiction."  366 B.R. at 918-19.  This was clear error.  A court may not engage in speculation when determining net income and reasonable and necessary living expenses.  See, e.g., In re Rose, 324 B.R. 709, 712 (B.A.P. 8th Cir. 2005).  To be reasonable and necessary, an expense must be "modest and commensurate with the debtor's resources."  In re DeBrower, 387 B.R. 587, 590 (Bankr. N.D. Iowa 2008). On this record, it is apparent that the court underestimated Jesperson's monthly net income and overestimated his reasonable and necessary living expenses in concluding he has no current surplus from which student loans could be repaid.  Compare In re Ekenasi, 325 F.3d 541, 548 (4th Cir. 2003).  A reasonable estimate would be a surplus of approximately $900 per month.

## III.

Jesperson's young age, good health, number of degrees, marketable skills, and lack of substantial obligations to dependents or mental or physical impairments weigh in favor of *not* granting an undue hardship discharge.  See, e.g., Oyler v. Educ. Credit

Mgmt. Corp., 397 F.3d 382, 386 (6th Cir. 2005); In re Gerhardt, 348 F.3d 89, 92-93 (5th Cir. 2003); Goulet v. Educ. Credit Mgmt. Corp., 284 F.3d 773, 779 (7th Cir. 2002); In re Burton, 117 B.R 167, 170 (Bankr. W.D. Pa. 1990). Thus, on this record, the only reason he has even a colorable claim of undue hardship is the sheer magnitude of his student loan debts. While the size of student loan debts relative to the debtor's financial condition is relevant, this should rarely be a determining factor:

> it would be perverse to allow the debtor to benefit from [his] own inaction, delay and recalcitrance by automatically granting discharge simply because the debt is a sizeable one. This, of course, would benefit those who delay and obstruct the longest and could encourage other students to follow the [same] course.

United States v. Kephart, 170 B.R. 787, 792 (W.D.N.Y. 1994).

When the size of the debts is the principal basis for a claim of undue hardship, the generous repayment plans Congress authorized the Secretary of Education to design and offer under the William D. Ford Federal Direct Student Loan Program become more relevant to a totality-of-the-circumstances undue hardship analysis. See Student Loan Reform Act of 1993, Pub. L. No. 103-66, tit. IV, § 4021, 107 Stat. 312, 341, codified at 20 U.S.C. § 1087e(d); 34 C.F.R. § 685.208. The most generous plan is the Income Contingent Repayment Plan ("ICRP"), which permits an eligible borrower to make "varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." § 1087e(d)(1)(D); see 34 C.F.R. § 685.209. Though the House and Senate bills initially provided that loans issued under the Direct Student Loan Program would not be dischargeable, the House Conference Report explained why this provision was deleted from the final bill:

> The conferees believe that current provisions of the Bankruptcy Code are sufficient to protect against unnecessary discharge of direct student loans

-6-

in bankruptcy. Section 523(a)(8) of the Bankruptcy Code operates to prevent the discharge of federally guaranteed education loans except in cases . . . where failure to allow the discharge would impose an undue hardship . . . . It is the intent of the conferees that loans made pursuant to the Federal Direct Student Loan Program would be subject to these same limitations on discharge.

H.R. Conf. Rep. No. 103-213, at 448-49 (1993), reprinted in 1993 U.S.C.C.A.N. 1088, 1137-38. Thus, undue hardship under § 523(a)(8) continues to require separate analysis under which, in this circuit, the ICRP is "a factor" to consider in evaluating the totality of the debtor's circumstances. In re Lee, 352 B.R. 91, 95 (B.A.P. 8th Cir. 2006). However, a student loan should not be discharged when the debtor has "the ability to earn sufficient income to make student loan payments under the various special opportunities made available through the Student Loan Program." In re VerMaas, 302 B.R. 650, 660 (Bankr. D. Neb. 2003).

Under the ICRP, an eligible debtor's annual loan payment is equal to twenty percent of the difference between his adjusted gross income and the poverty level for his family size, regardless of the amount of unpaid student loan debt. 34 C.F.R. § 685.209(a)(2)-(3). Repayments are made monthly. § 685.208(k). The Secretary recalculates the annual payment amount each year based on changes in the borrower's adjusted gross income and the HHS Poverty Guidelines and may adjust the obligation based upon special circumstances such as a loss of employment. §§ 685.209(a)(5), (c)(3). If the borrower has not repaid the loan at the end of twenty five years, "the Secretary cancels the unpaid portion of the loan." § 685.209(c)(4)(iv). The Secretary may require a borrower who has defaulted to repay the student loan pursuant to an ICRP, 20 U.S.C. § 1087e(d)(5)(B), confirming that the ICRP is an appropriate way for borrowers to avoid undue hardship while repaying their loans.[2]

---

[2]The Department of Education describes the ICRP as a plan that allows a borrower "to meet your Direct Loan obligations without causing undue financial hardship." Repayment Plans, Federal Student Aid,

ECMC presented undisputed evidence that its loans to Jesperson are eligible for the ICRP. Based on Jesperson's adjusted gross income at the time of trial, the bankruptcy court found that his 2008 monthly ICRP payments would be $629 per month for a family of one, $572 per month for a family of two, and $514 per month for a family of three, without regard to the size of his unpaid student loan balance. Thus, with a current surplus of $900 per month, the record establishes that he can make ICRP payments on his ECMC loans without compromising a minimal standard of living. In these circumstances, "the debt should not be discharged." Long, 322 F.3d at 554-55; see In re Faish, 72 F.3d 298, 306 (3d Cir. 1995).

The bankruptcy court and the district court rejected reliance on the ICRP because "it does not offer a fresh start" and "might even be viewed as inimical to the goals of the fresh start because the ICRP allows for negative amortization of the student loan debt and a potentially significant tax bill if the student loan is ultimately forgiven after 25 years." 366 B.R. at 915, quoting Lee, 352 B.R. at 97. We disagree. In § 523(a)(8), Congress carved an exception to the "fresh start" permitted by discharge for unpaid, federally subsidized student loans. If the debtor with the help of an ICRP program can make student loan repayments while still maintaining a minimal standard of living, the absence of a fresh start is not undue hardship.

The bankruptcy court and the district court also relied on a flawed analysis of the ICRP. To demonstrate "negative amortization," the bankruptcy court presented a chart showing Jesperson's student loan debt to ECMC growing to $1,746,256 over the twenty-five-year ICRP repayment period on account of the capitalization of unpaid interest if he made $514 monthly ICRP payments. But the chart ignored the ICRP's explicit ten percent limit on the capitalization of unpaid interest. 34 C.F.R. § 685.209(c)(5). Likewise, the court's reference to "a potentially significant tax bill"

_____

http://www.ed.gov/offices/OSFAP/DirectLoan/RepayCalc/dlindex2.html (last visited May 11, 2009).

when any unpaid balance is cancelled after twenty-five years ignored the fact that cancellation results in taxable income only if the borrower has assets exceeding the amount of debt being cancelled. See 26 U.S.C. § 108(a)(1)(B).

Jesperson is a paradigmatic example of a student loan debtor for whom ICRP eligibility combined with his other circumstances require a conclusion of no undue hardship. Near the start of his legal career, he seeks bankruptcy discharge of multiple student loan debts he never tried to repay. Recent employment is evidence that, if motivated, he will enjoy sustained legal employment in future years, profiting from his many years of loan-subsidized higher education. Based on Jesperson's "history of employment retention difficulty," the bankruptcy court thought it unlikely he would increase or even maintain his current rate of pay in the future. But this pessimistic speculation is unwarranted and inappropriate. A debtor is not entitled to an undue hardship discharge of student loan debts when his current income is the result of self-imposed limitations, rather than lack of job skills, and he has not made payments on his student loan debt despite the ability to do so. In re Loftus, 371 B.R. 402, 410-11 (Bankr. N.D. Iowa 2007). "With the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." In re Roberson, 999 F.2d 1132, 1136 (7th Cir. 1993). Here, Jesperson testified that he was unaware of the ICRP until "settlement negotiations" in this proceeding, further evidence of a less than good faith effort to repay his student loan debts.

On this record, we conclude that, with the aid of an income contingent repayment plan, Mark Allen Jesperson can presently make student loan payments without compromising a minimal standard of living, and he has the potential of repaying at least a substantial portion of his student loan debts during the ICRP repayment period. When a debtor is eligible for the ICRP, the court in determining undue hardship should be less concerned that future income may decline. The ICRP

formula adjusts for such declines, without regard to the unpaid student loan balance, which in most cases will avoid undue hardship. Therefore, however unattractive or unfair Jesperson may find this situation, he is not entitled to an undue hardship discharge under § 523(a)(8). The judgment of the district court is reversed, and the case is remanded with directions to enter an order declaring that Jesperson's student loan debts to ECMC are not discharged.

SMITH, Circuit Judge, concurring.

I concur in the court's judgment that, applying de novo review, Jesperson is ineligible for an undue hardship discharge of his student loan debt under 11 U.S.C. § 523(a)(8). I write separately to emphasize that whether the debtor enrolled in the Income Contingent Repayment Plan (ICRP) remains merely "a factor" to consider when applying the totality-of-the-circumstances test. In the present case, even assuming that Jesperson's decision to forgo enrolling in the ICRP was reasonable, other relevant factors, such as "Jesperson's young age, good health, number of degrees, marketable skills, and lack of substantial obligations to dependents or mental or physical impairments," *supra* Part III, establish that Jesperson does not represent the type of debtor experiencing undue hardship that Congress envisioned receiving the benefit of § 523(a)(8).

Section 523(a)(8) states that a debtor's student loan is not dischargeable "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." In evaluating whether a debtor's student loans would impose an "undue hardship," we apply the totality-of-the-circumstances test. *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 553 (8th Cir. 2003). "[F]airness and equity require each undue hardship case to be examined on the *unique facts and circumstances* that surround the particular bankruptcy." *Id*. at 554 (emphasis added). Bankruptcy courts should consider the following when evaluating the totality-of-the-circumstances:

(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) *any other relevant facts and circumstances surrounding each particular bankruptcy case*.

*Id*. (emphasis added). The debtor has the burden of proving undue hardship. *Reynolds v. Penn. Higher Educ. Assistance Agency (In re Reynolds)*, 425 F.3d 526, 529 (8th Cir. 2005).

Because the totality-of-the-circumstances test is "very broad," "courts in the Eighth Circuit have looked to a number of facts and circumstances to assist them in making this determination." *McLaughlin v. U.S. Funds (In re McLaughlin)*, 359 B.R. 746, 750. (Bankr. W.D. Mo. 2007). Such factors include:

(1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.

*Id*. (citing *VerMaas v. Student Loans of N.D. (In re VerMaas)*, 302 B.R. 650, 656–57 (Bankr. D. Neb. 2003); *Morris v. Univ. of Ark. (In re Morris)*, 277 B.R. 910, 914 (Bankr. W.D. Ark. 2002)).

Thus, a "debtor's good faith effort to lower [his or] her monthly payment by qualifying for an income contingent repayment plan is *a factor* in the undue hardship analysis." *Cumberworth v. U.S. Dep't of Educ. (In re Cumberworth)*, 347 B.R. 652, 661 (8th Cir. BAP 2006) (emphasis added). A bankruptcy court should not "plac[e] too much weight on [the debtor's] refusal to enroll in the ICRP." *Coco v. N.J. Higher Educ. Student Assistance Auth. (In re Coco)*, No. 08-2965, 2009 WL 1426757, at *4 (3d Cir. May 22, 2009) (unpublished). This is "because any discharged portion of [the debtor's] loan would be treated as taxable income at the time of the discharge, [meaning that the debtor's] participation in the ICRP could ultimately result in [the debtor] simply trading a student loan debt for an IRS debt." *Id*. Courts have rejected a "per se rule requiring enrollment in the ICRP" to establish a debtor's good faith effort to repay his or her student loans. *Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 364 (6th Cir. 2007); *see also Tirch v. Penn. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 682 (6th Cir. 2005). As the Sixth Circuit explained:

> Congress recently enacted "the most sweeping reform of bankruptcy law since the enactment of the Bankruptcy Code in 1978." Michael & Phelps, *supra*, at 77–78; *see also* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (codified in various sections of 11 U.S.C.). Yet Congress left § 523(a)(8)'s "undue hardship" language intact. Had Congress intended participation in the ICRP—implemented in 1994—to effectively repeal discharge under § 523(a)(8), it could have done so. In addition, requiring enrollment in the ICRP runs counter to the Bankruptcy Code's aim in providing debtors a "fresh start." The debtor is encumbered with the debt for an additional twenty-five years, regardless of the length of the student loans. If, at the end of the twenty-five years, the debtor has been unable to repay all the student loans, the remaining debt is canceled and that discharge of indebtedness is treated as taxable income. *See* Michael & Phelps, *supra,*

at 105. The result, as the bankruptcy court noted, would be that [the debtor] would "be trading one nondischargeable debt for another."

*Barrett*, 487 F.3d at 364.

But if a debtor merely refuses to enroll in the ICRP because he or she wants a "fresh start," indicating that the debtor has a "lack of interest in repaying [his or] her debt," then such factor certainly weighs in favor of *not* discharging the debt. *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 403 (4th Cir. 2005).

In the present case, considering the totality of the circumstances, one of which is participation in the ICRP, Jesperson exemplifies the type of debtor who *is not* eligible for a discharge of his student loan debt under § 523(a)(8). Jesperson (1) is well-educated, (2) is skilled in a specific profession (the law), (3) is young, (4) is in good health, (5) suffers from no physical or mental impairments at the present time, (6) is unmarried, (7) has the capacity to work, and (8) has made no payments toward his student loan debt, indicating a lack of interest in repaying his debt via the ICRP or otherwise. Jesperson's current situation seems to be the result of his own self-imposed limitations, evidenced by his routinely quitting jobs after a short period of time. Such a "patent lack of ambition, cooperation and commitment," *Jesperson v. U.S. Dep't of Educ. (In re Jesperson)*, 366 B.R. 908, 911 (Bankr. D. Minn. 2007), does not support a finding of dischargeability under § 523(a)(8). *See, e.g.*, *Spence v. Educ. Credit Mgmt. Corp. (In re Spence)*, 541 F.3d 538, 545 (4th Cir. 2008) (holding that debtor did not make a good faith effort to maximize her income, meaning that she did not satisfy the third factor of the *Brunner* undue hardship test for the dischargeability of student loan debt, where, although debtor was highly educated, she appeared to be satisfied working for a company as a mail services specialist, debtor had not made efforts to pursue a more lucrative line of work and admitted that she was not currently pursing other work at all, debtor did not fully explore the possibility of loan consolidation programs that offered reduced payments based upon a debtor's limited

income, and, while debtor made efforts to obtain available deferments and forbearances, after they expired she immediately filed for bankruptcy and had not made one payment on any of the loans held by student loan creditor); *U.S. Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 93 (5th Cir. 2003) (holding that "nothing in the Bankruptcy Code suggests that a debtor may choose to work only in the field in which he was trained, obtain a low-paying job, and then claim that it would be an undue hardship to repay his student loans"); *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 779 (7th Cir. 2002) ("As the bankruptcy court noted, Goulet is an intelligent man. The record does not reveal that he lacks usable job skills or that he is hindered by a limited education. In fact, because of the loans, he received an excellent education. The natural conclusion, when considering his exemplary educational record and nearly-completed graduate work, is that Goulet can apply himself when he desires to do so. The record does not demonstrate that he lacks the capacity to work, only that he does not seem anxious to do so."); *Loftus v. Sallie Mae Servicing (In re Loftus)*, 371 B.R. 402, 410–11 (Bankr. N.D. Iowa 2007) ("Several factors weigh against the discharge of Timothy's student loan obligations. He is young and in relatively good health. He has two graduate degrees in communications and education. He has acquired marketable knowledge and skills in the areas of communications and computer technology. Timothy's decision to live in a small town in northwest Iowa has been a self-imposed geographical limitation on his employment options. In recent years he has restricted his job search further by making very few applications and by applying for positions only at colleges and universities in the area. Timothy has not made his best effort to maximize income and reduce expenses . . . .Timothy argues that his student loan debt should be discharged because the total amount owed is more than $300,000. However, the size of the debt is a function of the large amount of money he borrowed—about $138,000 to attend graduate school—and the many years the loans have accrued interest and gone without payment. It appears that Timothy has never taken responsibility for the debt."); *Burton v. Penn. Higher Educ. Assistance Agency (In re Burton)*, 117 B.R. 167, 170 (Bankr. W.D. Pa. 1990) ("Debtor presently is unemployed. However, his education and skills are such that

Debtor reasonably can be expected in the foreseeable future to repay his student loans while living above the subsistence level. Debtor appears to be a talented artist with marketable skills. In addition, he has completed at least four (4) years of college and is obviously intelligent. Debtor unquestionably has the skills and training sufficient to enable him to find decent employment.").

Accordingly, based on the totality of the circumstances, I concur in the court's reversal of the judgment of the district court and its remand with directions to enter an order declaring that Jesperson's student loan debts to ECMC are not discharged.

BYE, Circuit Judge, joining, in part, Judge Smith's concurring opinion, and dissenting.

The court holds the bankruptcy court erred in discharging Mark Jesperson's student loans under 11 U.S.C. § 523(a)(8)'s undue hardship provision. I write separately to emphasize that, in accordance with the overwhelming majority of courts, a debtor is not ineligible for a hardship discharge if capable of making payments under the William D. Ford Federal Direct Student Loan Program's Income Contingent Repayment Plan (ICRP). 20 U.S.C. § 1087e(d)(1)(D); 34 C.F.R. § 685.208; see also 20 U.S.C. § 1087e(d) (authorizing the Secretary of Education to implement alternative plans for repayment of student loans). Additionally, I dissent from the majority's opinion denying Jesperson a hardship discharge, and its rejection of the bankruptcy court's findings of fact and application of those facts to its § 523(a)(8) analysis.

Under § 523(a)(8), student loans may be discharged for undue hardship. The debtor bears the burden of proof by a preponderance of the evidence, Ford v. Student Loan Guarantee Fund of Ark., 269 B.R. 673, 675 (B.A.P. 8th Cir. 2001), and the court determines undue hardship based on a "totality of the circumstances" test, In re Long, 322 F.3d 549, 554 (8th Cir. 2003). Under the test, the court considers 1) the debtor's past, present and reasonably reliable future financial resources, 2) a calculation of the

debtor's and his dependents' reasonable necessary living expenses, and 3) any other relevant facts and circumstances in the particular bankruptcy case.  Id.; Andrews v. S.D. Student Loan Assistance Corp., 661 F.2d 702, 704-05 (8th Cir. 1981).

> [I]f the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt – while still allowing for a minimal standard of living – then the debt should not be discharged. Certainly, this determination will require a special consideration of the debtor's present employment and financial situation – including assets, expenses, and earnings – along with the prospect of future changes – positive or adverse – in the debtor's financial position.

In re Long, 322 F.3d at 554-55.  "[F]airness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy."  Id. at 554.[3]

---

[3]Our totality-of-the-circumstances test differs from the three-prong test set forth in Brunner v. N.Y. State Higher Education Services Corporation, 831 F.2d 395 (2d Cir. 1987), which is followed in nearly all other circuits.  Under Brunner, a debtor must show 1) he cannot, based on existing income and expenses, maintain a minimal standard of living for himself and his dependents if required to repay student loan debt, 2) his affairs will persist for a significant portion of the repayment period, and 3) good faith repayment efforts.  Id. at 396.  The debtor bears the burden of proving each prong, and a failure to prove any prong renders the debt nondischargeable.  In In re Long, our court expressly rejected Brunner.

> [U]nder a Brunner analysis, if the bankruptcy Court finds against the Debtor on any of the three prongs of the test, the inquiry ends and the student loan is not dischargeable.  We prefer a less restrictive approach to the "undue hardship" inquiry.  We are convinced that requiring our bankruptcy courts to adhere to the strict parameters of a particular test would diminish the inherent discretion contained in § 523(a)(8)(B).

322 F.3d at 554 (internal citation omitted).

-16-

Wholly separate from bankruptcy law and § 523(a)(8)'s undue hardship discharge provision is the ICRP, one of four student loan repayment options administered by the Department of Education. Under the ICRP, the annual amount owed by the borrower is the lesser of the amount that would be paid if the borrower repaid the loans in twelve years, multiplied by an annual percentage factor based on adjusted gross income, or 2) twenty percent of the borrower's discretionary income. 34 C.F.R. § 685.209(a)(2). Discretionary income is defined as adjusted gross income minus the poverty guidelines, with an adjustment for family size. Id. at 685.209(a)(3). The ICRP requires a minimum monthly payment of five dollars, unless the formula results in no discretionary income. In such cases, the monthly payment is zero. Id. at 685.209(a)(6). If the payment is less than accrued interest, the unpaid interest is capitalized until the outstanding principal is ten percent greater than the original principal amount, after which interest continues to accrue but is no longer capitalized. Id. at 685.209(c)(5). The repayment period lasts twenty-five years, after which any unpaid balance is cancelled and may be reported to the Internal Revenue Service as taxable income. See In re Korhonen, 296 B.R. 492, 496 (Bankr. D. Minn. 2003).

A debtor's ability to qualify for the ICRP is only one factor to consider when undertaking the undue hardship inquiry. The availability of the ICRP does not trump our court's longstanding preference for case-by-case consideration of the "unique facts and circumstances that surround [each] particular bankruptcy," as embodied in our totality-of-the-circumstances test. In re Long, 322 F.3d at 554. Indeed, our court's precedent finds ample support in the legislative history of the ICRP and § 523(a)(8), and the case law of our sister circuits. Therefore, I emphasize that placing undue weight on a debtor's ability to qualify for the ICRP improperly limits the inherent discretion afforded to bankruptcy judges when evaluating requests for § 523(a)(8) relief, and reduces the totality-of-the-circumstances test to a simple arithmetical calculation.

-17-

The first provision making student loan debt nondischargeable was enacted as part of the Education Amendments of 1976. Pub. L. No. 94-482, § 127(a), 90 Stat. 2081, 2141 (codified at 20 U.S.C. § 1087-3 (1976) (repealed 1978). It was replaced by the Bankruptcy Reform Act of 1978, Pub. L. 95-598, § 523(a)(8), 92 Stat. 2549 (1978), under which student loan debt was nondischargeable for a five-year period following commencement of the repayment period, absent a showing of undue hardship. Congress later extended § 523(a)(8)'s period of nondischargeability to seven years, Pub. L. No. 101-647, § 3621(2), 104 Stat. 4789, 4965 (1990), and in 1998, eliminated any such provision from § 523(a)(8), Pub. L. No. 105-244, § 971(a), 112 Stat. 1581 (1998).

Prior to amending § 523(a)(8) in 1998, Congress implemented the William D. Ford Federal Direct Loan Program, Pub. L. No. 103-66, tit. IV(A) ch. 1, 107 Stat. 312 (1993) (codified at 20 U.S.C. § 1087a-h (2000), which established four repayment options for student loan debtors, including the ICRP plan set forth at 34 C.F.R. § 685.208. Despite Congress' proven willingness to amend § 523(a)(8) to further restrict the dischargability of student loan debt, and in spite of the availability of the ICRP option for repayment of student loans, Congress chose to continue the undue hardship exception to nondischargeability. Indeed, provisions in the House and Senate bills designed to make student loans conclusively nondischargeable were stripped from the bills in favor of maintaining § 523(a)(8)'s undue hardship exception to nondischargeability of student loan debt. Ante at 3-4.

Since 1976, Congress has demonstrated its willingness to restrict the ability to discharge student load debt, but has refused to abrogate § 523(a)(8)'s undue hardship provision. It expressly declined to do so when the ICRP was established, even though it offers a less onerous means by which student loan debt may be managed. Based on this legislative history, I conclude Congress' express refusal to further circumscribe or eliminate § 523(a)(8) demonstrates its continued viability – even when the ICRP is an available option. Notably,

Congress recently enacted the most sweeping reform of bankruptcy law since the enactment of the Bankruptcy Code in 1978. Yet Congress left § 523(a)(8)'s "undue hardship" language intact. Had Congress intended participation in the ICRP – implemented in 1994 – to effectively repeal discharge under § 523(a)(8), it could have done so. In addition, requiring enrollment in the ICRP runs counter to the Bankruptcy Code's aim in providing debtors a "fresh start." The debtor is encumbered with the debt for an additional twenty-five years, regardless of the length of the student loans.

In re Barrett, 487 F.3d 353, 364 (6th Cir. 2007) (internal quotation, footnote, and citations omitted).

This conclusion is also supported by decisions from every circuit to have addressed this issue. See, e.g., In re Mosley, 494 F.3d 1320, 1327 (11th Cir. 2007) (holding under the three-part Brunner test a debtor's failure to enroll in the ICRP is not a per se bar to a finding of good faith); In re Barrett, 487 F.3d at 364 (rejecting a per se rule requiring enrollment in the ICRP because it would eliminate § 523(a)(8)'s undue hardship provision from the Bankruptcy Code); In re Nys, 446 F.3d 938, 947 (9th Cir. 2006) (holding participation in a repayment plan is only one factor to be considered in determining whether debtor can prove undue hardship under the three-part Brunner test); In re Alderete, 412 F.3d 1200, 1206 (10th Cir. 2005) (noting participation in a repayment plan is not required to satisfy the Brunner test); In re Frushour, 433 F.3d 393, 402 (4th Cir. 2005) (noting participation in a repayment plan is an important consideration under the Brunner test, but not dispositive). While each of these cases was decided under the three-part Brunner test, and not our circuit's totality-of-the-circumstances test, they unanimously reject the proposition that eligibility for or participation in the ICRP precludes an undue hardship discharge of student loan debt under § 523(a)(8). Other courts, applying the totality-of-the-circumstances test, have repeatedly reached the same conclusion.

[T]he William D. Ford Program is no silver bullet for student loan creditors to avoid discharge of student loan debts owing to undue hardship if the creditors . . . demonstrate that a particular debtor did in fact know about and understand such alternatives for resolving student loan debts.

Cheney v. ECMC, 280 B.R. 648, 665 (N.D. Iowa 2002).

Similarly,

The defendants' argument is nothing less than a per se rule that there can never be a discharge of a student loan for an undue hardship where the debtor is eligible for the Income Contingent Repayment Plan. This cannot be right. The Income Contingent Repayment Plan cannot trump the Congressionally mandated individualized determination of undue hardship. The Income Contingent Repayment Plan is but one factor to be considered in determining undue hardship, but it is not determinative.

In re Korhonen, 296 F.R. 492, 496 (Bankr. D. Minn. 2003) (citations omitted).

And finally,

"[W]hile consideration of the debtor's repayment options is one factor that a court may consider in determining "undue hardship" under the totality-of-the-circumstances, I am unaware of any decision which holds that the availability of the William D. Ford Federal Direct Loan Program to a debtor – including its "income contingent repayment plan" option – by itself requires a finding that it would not be an "undue hardship" to repay the student loan obligation."

In re Bettie, 311 B.R. 496, 506 (Bankr. N.D. Ill. 2004) (quoting Newman v. ECMC, 304 B.R. 188, 195 (Bankr. E.D. Pa. 2002)).

The reasoning of these cases – coupled with a dearth of contrary precedent – convinces me the ICRP is but one factor for consideration when applying the totality-of-the-circumstances test, and does not act as an absolute barrier to the discharge of student loan debt under § 523(a)(8). Further, overemphasizing the impact of the ICRP would be antithetical to the exercise of judicial discretion mandated by § 523(a)(8) and reflected in our totality-of-the-circumstances analysis. Accordingly, I concur in Judge Smith's conclusion that the ICRP is merely a factor to consider under our court's totality-of-the-circumstances test.

Applying these principles, I dissent from majority's rejection of the bankruptcy court's findings of fact and application of those facts to its § 523(a)(8) analysis.

> In a bankruptcy appeal, this court sits as a second court of review; we therefore apply the same standards of review to the bankruptcy court's decision as the district court does. We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. The question of whether declining to discharge the debts would pose an undue hardship . . . is a question of law, which we review de novo. Subsidiary findings of fact on which the legal conclusion is based are reviewed for clear error.

In re Reynolds, 425 F.3d 526, 531 (8th Cir. 2005) (internal citations omitted).

For a finding to be clearly erroneous, it "must strike the reviewing court as more than just maybe or probably wrong; it must strike the court as wrong with the force of a five-week-old, unrefrigerated dead fish." In re Papio Keno Club, 262 F.3d 725, 728 (8th Cir. 2001) (quoting Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1998)). Findings necessary to a determination of undue hardship include, "a special consideration of the debtor's present employment and financial situation – including assets, expenses, and earnings – along with the prospect of future changes – positive or adverse – in the debtor's financial position." In re Long, 322 F.3d at 554-55.

The bankruptcy court found Jesperson had reasonable monthly expenses of $2857. This amount included $1000 for rent, $1000 in child support for two children, $325 for food, and $431.66 for vehicle maintenance, gas, and parking. To this amount, the court added $100 for vehicle insurance and additional vehicle maintenance. With the exception of the extra $100 in vehicle-related costs, the expenses determined by the bankruptcy court find adequate record support and are not clearly erroneous.

Jesperson has previously paid $700 per month for rent, and, although at the time of trial he was living in a relative's basement and anticipated spending only $500, the court concluded his future rent expenses would increase, and in the relevant urban housing market, $1000 was reasonable. Further, Jesperson was court ordered to pay $500 in monthly child support for one child, and, though no order was in place as to the second child, when financially able, he voluntarily paid child support for the second. As for the vehicle expenses, Jesperson owned a 1988 truck with over 200,000 miles on the odometer. He used the vehicle to drive to work, for visiting his children (one in Duluth), and to regularly attend AA meetings several times per week. These undisputed findings are not clearly erroneous and demonstrate the reasonable nature of Jesperson's claimed expenses. I reject the majority's assertion that Jesperson failed to demonstrate good faith because he aspired to live somewhere other than his brother's basement. I also reject the majority's implicit conclusion that in the absence of a court order, Jesperson's contributions toward the support of his second child cannot be credited. Furthermore, the court noted Jesperson's projected monthly budget failed to account for medical or dental expenses, savings or retirement, and he owned no assets with more than nominal value. Thus, I conclude it was not clearly erroneous to find Jesperson proved reasonable monthly expenses of at least $2750. Indeed, the bankruptcy court's belief that the expenses were understated is almost certainly true.

The district court also considered Jesperson's past, current, and future earning capacity. At the time of trial Jesperson was enjoying an unprecedented period of prosperity. For approximately four months, he had been earning the annual equivalent of $48,000, working in a temporary legal position. Prior to that, Jesperson took and abandoned two full-time legal jobs, as well as a third through a temp agency, and proved a failure at starting his own law practice. His adjusted gross income for the years leading up to his bankruptcy petition included: $13,207 in 2003; $14,828 in 2004; $21,584 in 2005; and $13,692 in 2006. The bankruptcy court found "his employment history does not openly demonstrate substantive ineptitude, [but] his record of work experience is besmirched by a patent lack of ambition, cooperation and commitment." These facts are undisputed, and based thereon, it was not unreasonable for the court to conclude "the expectation that Jesperson maintain or increase his current rate of pay is one part rational to two parts imagination."

The bankruptcy court next factored the availability of the ICRP into its totality-of-the-circumstances analysis. Assuming Jesperson maintained his current level of earnings – an assumption bordering on fanciful – his ICRP payment for a family of three (himself and two minor dependents) would be $514. The bankruptcy court, however, found, based on Jesperson's after-tax adjusted gross income and reasonable monthly expenses, his approximate monthly surplus was only $55. Thus, he was financially unable to make the ICRP payment. Moreover, even assuming Jesperson made a nominal monthly ICRP payment, i.e., $5 or even $0, the court concluded he would 1) never reduce the principal, 2) be unable to cover unexpected expenses, e.g., unfunded medical, dental, or vehicle replacement costs, and 3) never contribute to a savings or retirement plan. Instead, Jesperson would remain saddled with the debt, "only to look forward to a quarter century of negative amortization, the burden of poor credit and a cash-only lifestyle . . . ."

Once again, the bankruptcy courts findings are adequately supported by the record. But for a miscalculation with respect to the ICRP's ten percent cap on

capitalization of unpaid interest – which the majority seizes upon as if it has some material effect on Jesperson's dismal financial picture – the facts, and the court's analysis thereof, demonstrate that continuing to carry the undischarged student loan debt will relegate Jesperson and his two minor children to a life punctuated by constant financial crisis and impoverishment.

The court characterizes Jesperson as the "paradigmatic example of a student loan debtor for whom ICRP eligibility . . . requires a conclusion of no hardship." <u>Ante</u> at 8. The opinion, however, suggests a broader holding that would draw into its net *all* student loan debtors who are eligible for ICRP participation. I understand the court's frustration – Jesperson is not a sympathetic figure. After availing himself of the federal student loan program and amassing a large debt, he has failed to achieve any demonstrable success in his chosen profession, and has ignored his promise to repay the debt. Nonetheless, bankruptcy law does not only provide relief to the well-intentioned or to hapless victims of circumstance. Even malfeasants may seek a fresh start. Today's decision punishes Jesperson for his financial mismanagement and is the paradigmatic example of bad facts leading to bad law.

For the reasons stated herein, I respectfully dissent.

_____